UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES ex rel. FIORISCE LLC,<br><br>                   Plaintiff,<br><br>   v.<br><br>PERDOCEO EDUCATION CORPORATION;<br>COLORADO TECHNICAL UNIVERSITY, INC.;<br>AMERICAN INTERCONTINENTAL<br>UNIVERSITY, INC.;<br><br>                  Defendants. | Civil Action No.<br><br>To Be Filed *in Camera* and Under Seal<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT** |

Relator Fiorisce LLC ("Relator") brings this *qui tam* action on behalf of the United States against Perdoceo Education Corporation ("Perdoceo") and its subsidiaries, Colorado Technical University ("CTU") and American InterContinental University ("AIU"), (collectively, "Defendants") under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and alleges as follows:

## INTRODUCTION

1. This case is about Defendants' long-running scheme to extract hundreds of millions of dollars each year from the United States by securing federal financial aid money for educational services at Perdoceo's for-profit universities, CTU and AIU, that did not qualify for federal funding.

2. Defendants' scheme centers on their widespread, intentional failure to provide their students with the minimal amount of educational content—measured in "credit hours"—required under federal student aid programs. Defendants provide only a fraction of the minimum required credit hours so they can maximize student retention and keep financial aid money

flowing for the tens of thousands of students they enroll, most of whom receive federal financial aid.

3.     In 2011, the Department of Education ("DOE") established a federal definition of "credit hour" to ensure taxpayer dollars on student aid were spent wisely and equitably among institutions of higher education.  Under this federal definition, for a 4.5 credit course, a school must provide a minimum of 135 learning hours.  If it does not provide this minimum number of learning hours, the school does not qualify to receive financial aid.

4.     But for years, CTU and AIU have purposely evaded these strict financial aid requirements and failed to provide anywhere near the minimum learning hours required.  Instead, they have shortchanged students by delivering substandard courses through Perdoceo's "Intellipath" proprietary online-learning platform.  Perdoceo intentionally designed Intellipath to minimize the work students must do and the hours they must spend to complete CTU and AIU courses.  At the same time, CTU and AIU use the platform to overstate the number of credit hours these courses entail to ensure they meet the minimum requirements for financial aid.

5.     CTU and AIU then use these falsified credit hour assignments to support claims for payment under the federal student aid programs to which they would not otherwise be entitled because they did not meet minimum credit hour requirements.  The United States assesses CTU and AIU's assignment of credit hours when determining eligibility for student aid programs, as well as the amount of aid awarded and ultimately paid to the schools.  Had the United States known that CTU and AIU failed to provide the required educational content and falsified the credit hour assignments for their courses, and made false statements in furtherance of their scheme, the government would not have paid them and would have suspended them from financial aid eligibility altogether.

2

6.      Relator brings this action to stop Defendants from continuing to engage in this fraudulent activity and to recover on behalf of the United States the hundreds of millions of dollars it has paid Defendants in student aid for which they did not qualify.  Relator also brings this action to stop Defendants from continuing to victimize the hundreds of thousands of primarily low-income, disadvantaged students who have received just a fraction of the educational services they enrolled in CTU and AIU to receive and which these universities were paid to provide.

## PARTIES

7.      Through its principal, Relator Fiorisce LLC has firsthand knowledge of the fraud alleged herein.  Relator began working at CTU as a Lead Faculty member in the College of General Education and Psychology ("COGEP").  Relator's last position at CTU was COGEP University Program Director.  Through Relator's work, which included supervising and mentoring other faculty and overseeing their instructional approaches, Relator had a direct window into Defendants' fraudulent scheme and its impact on student education.  Relator repeatedly tried to stop the wrongdoing, raising concerns with the most senior members of CTU's administration.  Unsuccessful in these efforts, Relator was ultimately pressured to leave CTU.

8.      Perdoceo is a Delaware Corporation with its principal place of business in Schaumburg, Illinois.  Originally operating under the name Career Education Corporation ("CEC"), Perdoceo rebranded under its present name on January 1, 2020, following a decade of public scandals and state enforcement actions (unrelated to the conduct at issue here).

9.      Perdoceo wholly owns and operates CTU and AIU.  CTU is a Colorado corporation with its principal place of business in Schaumburg, Illinois.  CTU operates two campuses in Colorado, one in Aurora and the other in Colorado Springs.  It also operates online

degree programs nationwide.  CTU offers programs in General Education, Business, Computer Science and Technology, Nursing, and Engineering, among others.  Roughly 25,000 students are currently enrolled in CTU, the vast majority of whom received federal financial aid.

10.     As a for-profit college, CTU is classified as a "proprietary institution of higher education" under federal law.  34 C.F.R. § 600.5(a).

11.     CTU is currently operating under a Program Participation Agreement ("PPA") with DOE and has been since at least 2011.  CTU's PPA was most recently renewed in May 2019 and is effective through March 31, 2021.

12.     AIU is a Georgia corporation with its principal place of business in Schaumburg, Illinois.  AIU Online, LLC, operates for-profit colleges at physical campuses in Atlanta, Georgia and Houston, Texas, as well as through online degree programs nationwide.  AIU offers programs in General Education, Business, Healthcare, and Criminal Justice, among others. Roughly 8,000 students are currently enrolled in AIU, the vast majority of whom received federal financial aid.

13.     As a for-profit college, AIU is classified as a "proprietary institution of higher education" under federal law.  34 C.F.R. § 600.5(a).

14.     AIU is currently operating under a PPA with DOE and has been since at least 2011.  AIU's PPA was most recently renewed in May 2019 and is effective through March 31, 2021.  In renewing AIU's PPA, DOE placed AIU on "provisional certification" status due to an ongoing regulatory review (unrelated to the conduct at issue here).

15.     Although CTU and AIU maintain physical campuses, more than 90 percent of their students are enrolled in fully online academic programs.  CTU and AIU's online programs are asynchronous, meaning an instructor provides class materials, assignments, and examinations

4

that students complete on their own schedules.  This asynchronous instruction is primarily directed through Perdoceo's "Intellipath" online learning platform.

16.     CTU and AIU's graduation and retention rates are consistently around 25 percent or lower.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1345, 1367(a).

18.     This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants transact business or are found in the District.

19.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Defendants regularly conduct and/or conducted business within the District, maintained employees and offices in this District, and, as a result of the statutory violations alleged herein, submitted false claims and/or caused false claims to be submitted in this District.

20.     Under 31 U.S.C. § 3730(e)(4)(A) there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this complaint.  To the extent there has been any such public disclosure, Relator meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B).

## BACKGROUND

## I.     FEDERAL FUNDING UNDER TITLE IV OF THE HIGHER EDUCATION ACT

21.     Through Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, Congress enacted several student loan and grant programs to provide financial assistance to students seeking post-secondary education.  The two at issue in this case are the Federal Pell Grant Program and the Federal Direct Loan Program.

5

22.     The Pell Grant Program provides federal funds to assist undergraduate students with demonstrated financial need. 20 U.S.C. § 1070a; 34 C.F.R. § 690.1.  As the name implies, Pell Grants are not loans.  Students have no obligation to repay a Pell Grant absent unusual circumstances.  For award year 2020-21, the maximum Pell Grant award was $6,345, with the actual award amount depending on the student's cost of attendance, expected family contribution, and enrollment status (full-time or part-time).  Over the past few years alone, CTU and AIU students have collectively received hundreds of millions in Pell Grants—money that flows directly to CTU, AIU, and ultimately Perdoceo.

23.     In addition, through the Direct Loan Program, DOE makes subsidized and unsubsidized loans directly to eligible students and parents to help cover the cost of attendance at an eligible school. 34 C.F.R. § 685.101(a)(1).  For Subsidized Direct Loans, DOE pays the interest on a student's loan while they remain enrolled at least half-time, for the first six months after they leave school, and during any period of deferment.

24.     To receive this Title IV funding, schools must first complete an Application for Approval to Participate in the Federal Student Financial Aid Programs through the Electronic Application for Program Participation.  34 C.F.R. § 668.13(a).  And at least every six years, schools must submit a new application to recertify their participation in and eligibility for Title IV programs.  34 C.F.R. § 668.13(b).

25.     In the Application for Approval to Participate in the Federal Student Financial Aid Programs, the president, CEO, or chancellor of each school must certify:

[T]o the best of my knowledge and belief, all information in this document is true and correct. I understand that if my institution provides false or misleading information, (a) the U.S. Department of Education may deny the institution's request for eligibility to

6

participate in federal student financial aid programs and/or revoke eligibility once it has been granted and (b) the institution may be liable for all federal student financial aid funds it or its students received.

26.     If DOE accepts the application, the school must then enter into a PPA with DOE before receiving any Title IV funds.  20 U.S.C. § 1094(a); 34 C.F.R. § 668.14.  Each PPA expressly conditions a school's eligibility for federal funds on compliance with all statutory and regulatory provisions under Title IV, including meeting the minimum credit hour requirements.

## II.     FEDERAL CREDIT HOUR DEFINITION

27.     Credit hours are used to determine the eligibility of an institution and its educational programs for participation in Title IV programs, and to determine the eligibility of a student for Title IV assistance and the amount of the student's assistance.  DOE provides Title IV funding to colleges only for classes that meet specific credit hour requirements.  Credit hours reflect the amount of educational content, also known as "contact hours," involved in completing the course.

28.     In 2010, DOE promulgated regulations that define a "credit hour" as:

[A]n amount of work represented in intended learning outcomes and verified by evidence of student achievement that is an institutionally established equivalency that reasonably approximates not less than—

(1) One hour of classroom or direct faculty instruction and a minimum of two hours of out of class student work each week for approximately . . . ten to twelve weeks for one quarter hour of credit, or the equivalent amount of work over a different amount of time; or

7

> (2) At least an equivalent amount of work as required in paragraph (1) of this
>
> definition for other academic activities as established by the institution including
>
> laboratory work, internships, practica, studio work, and other academic work
>
> leading to the award of credit hours.

Program Integrity Issues, 75 Fed. Reg. 66832, 66846 (Oct. 29, 2010) (codified at 34 C.F.R. §

600.2 (2011)).

29.     DOE established this federal definition to curb "abuse" and inconsistent treatment

of federal funds spent on Title IV programs.  75 Fed. Reg. 34806, 34811 (June 18, 2010).

Specifically, in defining a credit hour, DOE stated that a "standard measure will provide

increased assurance that a credit hour has the necessary educational content to support the

amounts of Federal funds that are awarded to participants in Federal funding programs and that

students at different institutions are treated equitably in the awarding of those funds."  75 Fed.

Reg. at 66846.

30.     On March 18, 2011, DOE published additional guidance on these credit hour

regulations.  This guidance reiterated that the federal definition was designed to "address

vulnerabilities in the student aid programs that leave them open to fraud and abuse" and "to

safeguard taxpayer funds."  U.S. Dep't of Educ., Gen-11-06, Guidance to Institutions and

Accrediting Agencies Regarding a Credit Hour as Defined in Final Regulations Published on

October 29, 2010, at 1 (2011).  And it further emphasized that the federal credit hour definition

applies equally to the asynchronous online learning at issue here: "An institution that is offering

asynchronous online courses would need to determine the amount of student work expected in

each online course in order to achieve the course objectives, and to assign a credit hour based on

at least an equivalent amount of work as represented in the definition of credit hour."  *Id*. at 6.

### III.    CREDIT HOURS AND ELIGIBLITY UNDER TITLE IV

31.    The federally defined credit hour provides "a quantifiable, minimum basis for a credit hour that, by law, is used in determining eligibility for, and the amount of, Federal program funds that a student or institution may receive." 75 Fed. Reg. at 66845. At the institutional level, for-profit schools like CTU and AIU must qualify as "eligible institutions" providing "eligible programs" to participate in Title IV funding for those programs. 34 C.F.R. § 600.2 (defining "eligible institution"); *id.* § 600.5(a)(5)(i)(A). Likewise, students must be enrolled in an eligible program at an eligible institution to obtain assistance under Title IV. 34 C.F.R. § 668.32(a)(1)(i).

32.    For undergraduates, the HEA defines an "eligible program" as requiring at least 24 credit hours of academic instruction, unless the student has already obtained an associate degree, in which case 12 credit hours must be provided. 20 U.S.C. § 1088; *see also* 34 C.F.R. § 668.8(d)(1)(ii). Schools confirm compliance with this requirement by reporting the number of credit hours required for each of their eligible programs as part of their Application for Approval to Participate in the Federal Student Financial Aid Programs.

33.    Under several Title IV programs, including the Direct Loan Program, students must be enrolled on at least a half-time basis to receive federal aid. 34 C.F.R. §§ 685.200(a)(1)(i), 668.32(a)(2). Accordingly, students enrolled at AIU or CTU must carry an academic workload equal to at least 6 federally defined credit hours per quarter to participate in the Direct Loan Program. A student's enrollment status also determines the amount of financial assistance they receive under the Pell Grant Program.

34.    Each year, the Secretary of Treasury publishes a "Payment Schedule" and "Disbursement Schedule" for the Pell Grant Program outlining the grant amounts that students

9

will receive for the coming award year.  34 C.F.R. §§ 690.2, 690.62(a), 690.63(b).  The Payment Schedule provides the grant amounts for full-time students, while the Disbursement Schedule does so for three-quarter-time, half-time, or less-than-half-time students.

35.     The Pell Grant amounts set out in the Payment Schedule and Disbursement Schedule are prorated based on enrollment status.  A half-time student will receive half the grant amount of a similarly situated full-time student, while a three-quarter-time student will receive three-fourths of the full-time amount.  Students enrolled less-than-half-time receive one-fourth of the full-time amount.

36.     As these rules make clear, credit hour assignments determine Title IV eligibility and award amounts.  Accordingly, schools are responsible for ensuring that the credit hours they ascribe to courses reflect the required amount of learning hours and educational content under the federal definition.  If a school fails to meet credit hour requirements, DOE may force the school to repay the Title IV funds, levy fines, and limit, suspend, or terminate its participation in Title IV programs altogether.

## IV.   CERTIFICATIONS AND CLAIMS FOR PAYMENT UNDER TITLE IV

37.     For all Title IV programs, the disbursement of federal funds depends on a school's statements and certifications of compliance with various Title IV requirements, including representations regarding the number of credit hours provided to students.

38.     Under both the Pell Grant and Direct Loan programs, a student initiates the application process by submitting a Free Application for Federal Student Aid ("FAFSA") to DOE.  Among other things, this allows DOE to calculate an expected family contribution for Pell Grant recipients.  34 C.F.R. § 690.12(a).

10

39.     DOE then sends the student's application information and expected family contribution back to the student on a Student Aid Report ("SAR") and to schools selected by the student on an Institutional Student Information Record ("ISIR").  34 C.F.R. § 690.13.  A student seeking a Direct Loan must also complete a Master Promissory Note ("MPN") and submit the MPN to the school.  34 C.F.R. §§ 682.102, 685.201.

40.     Parents may also obtain a Parent PLUS loan through the Direct Loan Program to help pay tuition and other related costs of education for their children.  34 C.F.R. §§ 682.102(c), 685.200(c).  A parent borrower commences the loan process by completing and submitting a Direct PLUS MPN for a Parent Direct PLUS loan.  34 C.F.R. § 685.201(b).

41.     The school then uses the information provided in the SAR, ISIR, and MPN to determine the student's eligibility under the Title IV programs.  The school presents the student with a "financial aid package" that may include Pell Grants, Direct Loans, or Campus-Based Aid (which includes Federal Supplemental Educational Opportunity Grants and Federal Work-Study), as well as other scholarships or aid for which the student may be eligible.

42.     In doing so, schools are required to determine a student's enrollment status—full-time, three-quarter-time, half-time, or less—and the corresponding Pell Grant award is based on that enrollment status, the program's cost of attendance, and the student's expected family contribution.  34 C.F.R. § 690.63.  After calculating a student's Pell Grant disbursement amount, schools must electronically transmit the student's Pell Grant disbursement data to DOE.  34 C.F.R. § 690.61.

43.     Likewise, schools must determine a student's eligibility for the Direct Loan Program, as well as the amount of each type of loan (subsidized or unsubsidized) that the student is eligible to receive.  34 C.F.R. § 685.301(4), (5).  As noted above, students must be enrolled at

11

least half-time to participate in the Direct Loan Program.  34 C.F.R. §§ 685.200(a)(1)(i), 668.32(a)(2).

44.     If the student accepts a Pell Grant or Direct Loan, the school requests payment from DOE through an electronic "origination" record—called a "Common Record"—that it submits through an electronic database called the Common Origination and Disbursement ("COD") System.  The school must ensure that all information submitted to the COD system is complete and accurate.  34 CFR § 685.301(a)(1).  Among other things, the Origination Record includes the school's determination of the student's enrollment status, award amount, and disbursement dates and amounts.

45.     If the information submitted by the school on the COD System is consistent with Title IV program requirements and the student's SAR and ISIR, DOE will make payment on the Common Record claim submitted through the COD System by making funds available for the school to electronically draw down through a system known as "G5."

46.     Before drawing down funds in the G5 system, schools must certify that the "funds are being expended . . . for the purpose and condition of the [PPA]."  Unless schools submit this express certification of compliance, which imbeds the PPA's requirement that the school comply with all Title IV requirements, including meeting the minimum credit-hour requirements, they cannot receive any funds from Title IV programs.  In this way, the minimum credit-hour requirements are for participating schools both a condition of payment under and a condition of participation in all Title IV funding programs.

## V.     INTELLIPATH EDUCATION TECHNOLOGY

47.     Intellipath is Perdoceo's self-branded, proprietary education technology that CTU and AIU have used as the basis for their scheme to secure Title IV funding for which they do not

qualify. Perdoceo licenses Intellipath from CCKF, a Dublin-based company that does business as Realizeit. However, Perdoceo is a major investor in CCKF (owning a significant percentage of its shares), and CCKF's leadership is largely comprised of former Perdoceo executives. Realizeit CEO Manoj Kulkarni is the former Chief Technology and Innovation Officer at Perdoceo's predecessor CEC. Realizeit VP for Client Success Prabhu Balashanmugamand and Realizeit Chief Sales, Marketing & Strategy Officer Ty Robert also had leadership roles at CEC prior to joining Realizeit. Along with Realizeit, Perdoceo's Vice President of Technology, Judith Komar, played a key role in designing Intellipath. She also oversees its use at CTU and AIU.

48. CTU and AIU market Intellipath as an adaptive learning platform that provides a "personalized" learning path in each course for every student. They claim Intellipath streamlines the learning process by skipping material students already know and focusing them on what they need to learn. In truth, Defendants have designed Intellipath to bypass most of the course material by employing a diagnostic test called "Determine Knowledge." This is a test students take at the start of each unit (there are five per course) to ostensibly evaluate their prior knowledge of the material in the unit. The tests are easy and set up so that students can essentially guess their way through the questions and then skip the majority of lessons (if not all the lessons) in each unit.

49. Defendants' real purpose for Intellipath is to push students through their courses in the shortest amount of time possible without any regard for the educational content the students receive or the minimum credit hours CTU and AIU are required to provide. For Defendants, Intellipath has nothing to do with improving the education process. It is simply about maximizing student retention and the Title IV funding that comes with it.

50.     Defendants designed Intellipath as an educational shortcut by steering students to skip through most of their course content.  Intellipath either automatically bypasses lessons or directs students to do so.  The technology is even designed to "back fill" earlier lessons as if students had completed them.  Critically, Defendants count towards the minimum credit-hour requirements all the content and learning time Intellipath directs students to avoid.  And Defendants do nothing to reallocate these purposely bypassed learning hours and class content to additional or alternative material on Intellipath or elsewhere.  Students never make up these missing hours and content.  Intellipath then automatically grades the minimal work the students do with no input from instructors.  All for the purpose of making it virtually effortless for students to take and pass courses, and ultimately stay enrolled in school.

## DEFENDANTS' FRAUD IN SECURING TITLE IV FUNDING

**I.    DEFENDANTS' FAILURE TO MEET THE MINIMUM CREDIT HOUR REQUIREMENTS**

51.     Virtually all of the CTU and AIU course offerings are 4 or 4.5 credit hours, which means for these classes to qualify for Title IV funding they must include a minimum of 120 to 135 total learning hours, respectively.[1]  But because Perdoceo devised a scheme to cause Intellipath to skip students past most of the educational content, CTU and AIU have failed to provide tens of thousands of students anywhere near the required minimum learning hours while improperly reaping hundreds of millions of dollars in financial aid.

52.     Directed by Perdoceo's senior leadership, including Ms. Komar, CTU Provost Dr. Connie Johnson has been the primary driver of the scheme at CTU, with her singular aim to

---

[1] Learning hours are also referred to as "course work," "contact hours," "time-on-task," and "learning activities."

14

maximize student retention—and financial aid money—at any cost.  Openly assisting Ms. Komar and Dr. Johnson in this fraud are CTU's Vice Provost Dr. Douglas Stein and former COGEP Dean Dr. Tonya Troka.  All of them are complicit in CTU's pervasive failure to provide the minimum required learning hours to the vast majority of CTU's students for years and in engaging in a cover-up scheme to hide the fraud.  This small group has unique access to an internal dashboard and various internal reports revealing the actual time spent on Intellipath by students in all courses at the college.  This small CTU leadership group purposely keeps this information from other CTU personnel, most importantly, the faculty responsible for providing and overseeing the content and coursework provided through Intellipath.

53.     Additional Intellipath data this core group reviews includes reports on high enrollment courses in General Education, such as English, Math, University, History, Sociology, and Psychology.  These reports unequivocally demonstrate CTU's widespread failure to provide the minimum credit hours required under Title IV.  What follows is just a sampling of this evidence from several CTU course offerings.

English 104 and 105

54.     English 104 and 105 are 4.5 credit hour courses requiring CTU to offer (and students to spend) 135 learning hours to complete each course.  For both classes, CTU certifies that these courses meet this minimum credit-hour requirement largely based on the roughly 100 hours of course time CTU attributes to student time on Intellipath (CTU reporting the balance of the requirement being made up by student participation in discussion boards and preparing a short final paper).  However, according to the internal Intellipath reports available only to Dr. Johnson and her group, the average time spent on Intellipath for these classes has been far lower than 100 hours, and nowhere near enough to meet the minimum credit hour requirements.

15

55.     For example, for the roughly 3,300 students who took English 104 in 2020, the average time spent on Intellipath was less than 6 hours.  Specifically, the average time was 6.17 hours for the 1,196 students who took this class in the first quarter; 5.35 hours for the 1,112 students who took this class in the second quarter; and 5.51 hours for the 1,039 students who took this class in the third quarter.

56.     For the roughly 5,800 students who took English 105 in 2020, the average time spent on Intellipath was likewise less than 6 hours.  Specifically, the average time was 5.58 hours for the 2,061 students who took this class in the first quarter; 5.25 hours for the 1,823 students who took the class in the second quarter; and 5.01 hours for the 1,896 students who took the class in the third quarter.

57.     English 104 reports broken out by individual student reveal the same significant hour shortfall.  These student-level reports include the student's name, the total lessons the student completed in each unit, the average time the student spent on each lesson, the student's average score, the total number of lessons the student completed for the course, and the overall time the student spent on the course.  As just one example, a breakout by student of English 104 2003B – Q3 2020 shows the average time students spent on Intellipath was 4.9 hours.  Looking just to the first student listed on the corresponding report, excerpted below, the student spent 6.92 hours on Intellipath (93 lessons times 4.33 minutes for each lesson (divided by 60)), completing every unit and finishing the course with an average score of 55 percent.

16

| Person | Objective (core) | Total less | Average time (mins) | Average score |
|---|---|---|---|---|
| ▆▆▆▆▆ | Unit 1: Extra Credit | 2 | 0.64 | 0% |
| | Unit 1: Starting Your Writing J | 36 | 4.57 | 56.52% |
| | Unit 2: Developing Your Introc | 9 | 6.15 | 40.56% |
| | Unit 2: Extra Credit | 2 | 0.06 | 0% |
| | Unit 3: Drafting Your Essay | 24 | 3.84 | 61.50% |
| | Unit 3: Extra Credit | 2 | 0.1 | 0% |
| | Unit 4: Extra Credit | 2 | 0.11 | 0% |
| | Unit 4: Revising Your Draft | 10 | 7.02 | 54.96% |
| | Unit 5: Your Final Essay | 6 | 3.14 | 37.50% |
| Total for | ▆▆▆▆▆ | 93 | 4.33 | 54.66% |

58.     In a similar report for English 105 2003A, the average time students spent on
Intellipath was 4.08 hours.  Again, looking just to the first student listed on the corresponding
report, the student spent just 1.57 hours on Intellipath (46 lessons times 2.05 minutes for each
lesson), completing just three of five units but passing the course with an average score of 80
percent.

        University 104 and 201

59.     University 104 and 201 are 4.5 credit hour courses CTU offers and which it also
certifies meet the minimum credit-hour requirement largely based on the roughly 100 hours CTU
attributes to student time on Intellipath (in addition to student participation in discussion boards
and live chat).  But according to the internal Intellipath reports, the average time spent on
Intellipath for these classes is far lower.  For example, for the roughly 13,500 students who took
UNIV 104 in 2020, the average time spent on Intellipath was less than 6 hours.  Specifically, the
average time was 5.33 hours for the 5,322 students who took this class in the first quarter; 5.18
hours for the 5,197 students who took this class in the second quarter; and 5.13 hours for the
2,958 students who took this class in the third quarter.

60.     The average student-level breakout for this class was 4.67 hours.  Taking just the
first student listed on the corresponding report, the student spent a mere 1.34 hours on Intellipath

17

(33 lessons times 2.45 minutes per lesson), completing every unit and passing the course with an average score of 86 percent.

| Person | Objective (core) | Total lessons | Average time (mins) | Average score |
|---|---|---|---|---|
| ▮ | Unit 1: Understanding and Navi | 16 | 2.11 | 92.97% |
| | Unit 1: Extra credit | 1 | 0.22 | 0% |
| | Unit 2: Successfully Integrating | 6 | 4.98 | 81.25% |
| | Unit 2: Extra credit | 1 | 0.18 | 0% |
| | Unit 3: Developing the Mindset | 2 | 2.14 | 75% |
| | Unit 3: Extra credit | 1 | 0.17 | 0% |
| | Unit 4: Strategies for Achieving | 2 | 1.08 | 28.57% |
| | Unit 4: Extra credit | 1 | 0.3 | 0% |
| | Unit 5: Financial Literacy | 2 | 4.92 | 87.50% |
| | Unit 5: Extra credit | 1 | 0.07 | 0% |
| Total for ▮ | | 33 | 2.45 | 86.24% |

61.     Similarly, in a breakout by student of University 201 2003B, the average time students spent on Intellipath was 5.82 hours.  Taking just the first student listed on the corresponding report, the student spent only 6.72 hours on Intellipath (30 lessons times 13.44 minutes), completing every unit and passing with an average score of 88 percent.

<u>Math 102</u>

62.     Math 102 is a 4.5 credit course that again CTU certifies meets the minimum credit-hour requirements largely based on the hours CTU attributes to student learning time spent on Intellipath.  But again, the actual time students spend on Intellipath is far less.  In a breakout by student of Math 102 2003B, the average time students spent on Intellipath was 11.14 hours. Taking just the first student listed on the corresponding report, the student spent 9.72 hours on Intellipath (44 times 13.26 minutes), finishing every unit and passing with an average score of 81 percent.

| Person | Objective (core) | Total lessons | Average time (mins) | Average score |
|---|---|---|---|---|
| ██████████ | MATH102 Unit 1: Extra C | 4 | 1.61 | 75% |
| | Unit 1: Signed Numbers | 5 | 37.57 | 88.33% |
| | MATH102 Unit 2: Extra C | 4 | 3.13 | 75% |
| | Unit 2: Fractions, Ratios, | 9 | 13.03 | 93.75% |
| | MATH102 Unit 3: Extra C | 2 | 0.86 | 0% |
| | Unit 3: Decimals and Per | 7 | 16.07 | 80% |
| | MATH102 Unit 4: Extra C | 2 | 0.33 | 0% |
| | Unit 4: Application of De | 9 | 15.91 | 72.94% |
| | MATH102 Unit 5: Extra C | 2 | 0.76 | 0% |
| Total for ██████████ | | 44 | 13.26 | 80.86% |

63.     Similarly, in a breakout by student of Math 102 1803B, the average time students spent on Intellipath was 10.14 hours.  Taking the first student listed on the corresponding report, the student spent 11.64 hours on Intellipath (88 times 7.94 minutes), finishing every unit and passing with an average score of 71 percent.

History, Sociology, and Psychology

64.     CTU employs this scheme of pretending students spend far more hours on Intellipath than they actually do, and nowhere near the amount of time needed to meet the minimum credit-hour requirements, across the majority of CTU's course offerings.  Additional examples of this pattern and practice include History 101 1803B, Sociology 102 2003B, and Psychology 102 1803B.  In these three courses, the average times in Intellipath hovered around just 10 hours, again far lower than the time needed to meet the minimum credit-hour requirements.

65.     In History 101 1803B, the average time students spent on Intellipath was 10.31 hours.  Taking the first student listed on the corresponding report, the student spent 37 minutes (11 lessons times 3.38 minutes per lesson), finishing every unit and passing with an average score of 75 percent:

19

| Person | Objective (core) | Total lessons | Average time (mins) | Average score |
|---|---|---|---|---|
| ▮▮▮▮▮ | Unit 1: The Post-Wa | 3 | 2.47 | 100% |
| | Unit 2: Social Unres | 3 | 2.42 | 62.50% |
| | Unit 3: The Post-Wa | 1 | 0.12 | 0% |
| | Unit 4: The Technol | 2 | 8.88 | 50% |
| | Unit 5: Terrorism an | 2 | 2.33 | 87.50% |
| Total for ▮▮▮▮▮ | | 11 | 3.38 | 75% |

66.　In Sociology 102 2003B, the average time students spent on Intellipath was 10.07 hours. Taking the first student listed on the corresponding report, the student spent 3.84 hours (46 lessons times 5.01 minutes per lesson), finishing every unit and passing with an average score of 71 percent:

| Person | Objective (version) | Total activi | Total time | Average score |
|---|---|---|---|---|
| ▮▮▮▮▮ | Unit 1: Sociology (CTU 20 | 20 | 1:24 | 73.48% |
| | Unit 2: Culture and Subc | 7 | 1:11 | 62.87% |
| | Unit 3: Sociological Inter | 7 | 1:12 | 70.17% |
| | Unit 4: Sociological Rese | 9 | 0:44 | 74.24% |
| | Unit 5: Reflection and Sc | 3 | 0:29 | 60% |
| Total for ▮▮▮▮▮ | | 46 | 5:01 | 70.94% |

67.　In Psychology 102 1803B, the average time students spent on Intellipath was 9.40 hours. Taking the first student listed on the corresponding report, the student spent 14 hours (89 lessons times 9.52 minutes), finishing units 2-5 and passing with a score of 64 percent:

| Person | Objective (core) | Total activities | Total time | Average score |
|---|---|---|---|---|
| ▮▮▮▮▮ | Unit 2: Biology of the Brain | 15 | 1:17 | 48.52% |
| | Unit 3: Development, Person | 40 | 5:07 | 70.51% |
| | Unit 4: Learning and Memory | 19 | 2:19 | 66.67% |
| | Unit 5: Psychiatric Disorders | 15 | 1:09 | 67.86% |
| Total for ▮▮▮▮▮ | | 89 | 9:52 | 63.83% |

68.　AIU has used Intellipath in exactly the same way to minimize the number of hours students must spend on course work to successfully complete their classes. While Relator did not have access to AIU's internal Intellipath reports, Relator knows from Relator's work at

20

CTU and Relator's efforts to stop the university from engaging in this fraud (as explained below) that AIU has engaged in the very same scheme all driven by Perdoceo's senior leadership, including Ms. Komar.  As with the examples listed above, a review of the actual time AIU students have spent on Intellipath for AIU's various course offerings will show a number of hours far lower than what AIU has reported and far lower than what would be needed to meet the minimum credit hour requirements for these classes.

69.     Providing college-level work and meeting the minimum credit hour requirements are mandatory to receive federal student aid under Title IV.  As DOE has made clear, the federally defined credit hour provides "a quantifiable, minimum basis for a credit hour that, by law, is used in determining eligibility for, and the amount of, Federal program funds that a student or institution may receive."  75 Fed. Reg. at 66845.  It ensures that the credit hours assigned by schools have "the necessary educational content to support the amounts of Federal funds that are awarded to participants in Federal funding programs and that students at different institutions are treated equitably in the awarding of those funds."  *Id.* at 66846.

70.     Consistent with this purpose, the government would not have paid CTU and AIU claims for Title IV aid had it known that they failed to provide the necessary learning hours under federal credit hour requirements.  Indeed, DOE would have suspended CTU and AIU from participating in federal student aid programs based on their violations of federal law and their PPAs.

71.     Perdoceo could have designed Intellipath to provide a sufficient amount of college-level content that would naturally result in students spending the required 135 contact hours per course.  Or it could have designed Intellipath to skip easier content and reallocate the required contact hours to material a student needs to learn.  Quality aside, Perdoceo could have at

21

a minimum designed Intellipath to require students to clock a certain amount of time on the platform. But Perdoceo is not concerned with the quality of their students' education or ensuring CTU and AIU provide the minimum number of required credit hours. Perdoceo's sole objective is keeping students enrolled and maximizing the Title IV funding it receives at their behest.

## II.     DEFENDANTS' FALSIFICATION OF LEARNING HOUR REPORTS

72.     Knowing they do not provide anywhere near the learning hours required under federal credit hour regulations, CTU and AIU have falsely inflated the number of hours recorded on Intellipath to meet these minimum requirements and remain eligible for Title IV funding.

73.     At CTU, for Dr. Johnson and her group, that has involved hiding the Intellipath data from faculty, staff, and the Higher Learning Commission ("Commission"), the accrediting agency for post-secondary education institutions in the Central United States. Historically, CTU did not even have a formal methodology for calculating learning hours. This changed in 2017 when the Commission conducted a routine audit at CTU to review various policies and procedures. During the visit, the Commission noted a deficiency in how CTU documents calculation of learning hours to ensure compliance with federal credit hour regulations. The Commission was concerned CTU did not have transparent policies or a reliable method to calculate student work.

74.     Executives at Perdoceo (CEC at the time), including Vice President of Technology Judith Komar, along with CTU's Dr. Johnson and Dr. Stein, knew that accurately documenting the actual hours students spent on Intellipath would have revealed their ongoing credit hour fraud scheme. Nonetheless, following the Commission's visit, they were alarmed that CTU's accreditation was in jeopardy and they needed to find a way to respond to the Commission while also hiding the actual Intellipath data from them.

22

75.     Dr. Johnson's first step was to instruct faculty to conduct a comprehensive review of any existing credit ascription documentation and to calculate the time spent on each learning activity in CTU's courses.  Faculty could not complete this task, however, given the lack of information for each course.  With the Commission's mandate to demonstrate CTU's calculation of learning hours, Dr. Johnson had no choice but to develop a new "credit ascription" process to determine the contact or learning hours for each course.

76.     Dr. Johnson assigned the credit ascription project to Dr. Susan Malekpour, CTU's former Vice Provost.  In or around October 2017, Dr. Malekpour assembled a team of faculty to create new documentation for each course.  The team included Relator, Dr. Troka, and several representatives from COGEP.  The team created templates called credit ascription worksheets ("CAWs") along with a handbook detailing a process to verify courses met the minimum learning hour requirements.  The CAW template was designed so faculty could calculate the time commitment of each activity (e.g., Intellipath, reading, discussion boards) and ensure total learning hours met federal credit hour requirements.

77.     However, despite this facial attempt to design a framework to accurately report the learning hours students spent on course work, Dr. Johnson and her group recognized throughout that they would need to inflate the hours reported on Intellipath to meet the minimum credit-hour requirements.  To accomplish this, they designed the CAW to take the "maximum time spent [by a student], excluding outliers" for each section, after the course was completed, and retroactively populate that time in the CAW *for each student in the course*.[2]  Dr. Johnson

[2] CTU defines "outliers" not as the maximum or minimum time reported by any student, but merely as mis-transcriptions or mistakes in the data.

23

and her group told Relator and others working on the project that using the maximum hours was a fair representation of actual hours because the maximum time spent by the top student was within a few hours of the average time spent by all students.  Dr. Johnson and her group knew this was not the case, but wanted to conceal the startlingly low times virtually all students actually spent on Intellipath.

78.     If CTU used the actual time students spent on Intellipath for credit hour calculations, or even the average of this time (as opposed to the maximum student time), none of the course offerings would meet the minimum credit-hour requirements.  They would not even come close.  As just one example, in English 104, there was only <u>one</u> student in 2020 across 5 different class sections who met or exceeded the more than 90 hours of Intellipath class time CTU allocated for the course.  Even worse, the average Intellipath time for all the students spent on this class was only 5.6 hours (even including students who withdrew from the class).  Of the students who completed all five units, the average time was just 7.9 hours (with a median of only 5.3 hours).

79.     To further cement and conceal this scheme to inflate the actual time students spent on Intellipath for CTU's course offerings, Dr. Johnson instructed faculty completing the CAWs to leave the Intellipath portion of the CAWs blank, directing Dr. Troka to fill in all Intellipath data.  Perdoceo's Ms. Komar provided Dr. Troka with Intellipath student reports revealing the actual times students spent by course, and Dr. Troka dutifully filled the maximum Intellipath times into the corresponding CAWs.  Dr. Troka resigned in March 2018, shortly after the project was completed.  Virtually none of the CAWs on which Dr. Troka input Intellipath times have been updated and, at least as of November 2020, CTU uses them to support its claimed compliance with the minimum credit hour requirements.

80.     CTU has maintained this scheme through this day, falsely inflating the student hours reportedly spent on Intellipath.  All of the CAWs CTU prepares for new classes, or the ones Dr. Troka prepared, which CTU still relies on for preexisting classes, are false records and provide no support for calculating credit hours for financial aid.  Had the government known CTU falsified its records for calculating contact hours, DOE would not have paid CTU claims for Title IV aid and would have suspended CTU from participating in federal student aid programs.

81.     AIU has engaged in the exact same stratagem.  Like CTU, AIU uses Intellipath in the majority of its courses, employing Determine Knowledge to skip students past lessons, allowing them to complete courses in a very short amount of time, nowhere near the minimum number of credit hours to qualify for federal student aid.  And like CTU, AIU has inflated the number of hours it reports for students on Intellipath to make up for this massive credit-hour shortfall.

82.     Instead of using the maximum student-hour device CTU employs, however, AIU uses a more mechanical approach.  In both cases, the school ignores the actual hours students spend Intellipath and report a much higher number of hours to ensure compliance with the minimum credit-hour requirements.

83.     Specifically, AIU counts Intellipath time as "45 minutes per lesson for 100 level classes, 60 minutes per lesson for 200, 300, 400 and grad level courses."  The actual time students spend per lesson on Intellipath is substantially shorter, typically amounting to a few minutes per lesson or even less.  In many instances the actual time per lesson is zero as Intellipath allows and even encourages students to skip the lessons altogether.  The end result at

25

AIU is the same as it is at CTU.  The school reports a grossly inflated number of Intellipath

hours for each student, entirely disregarding the actual time the student spent on Intellipath.

84.     By failing to provide its students the credit hours it claims to provide, and by

falsifying its credit ascription documents, AIU like CTU fraudulently obtained hundreds of

millions of dollars in financial aid.  The government would not have paid AIU's claims for Title

IV aid had it known that it failed to provide the necessary learning hours under federal credit

hour requirements.  Indeed, DOE would have suspended AIU from participating in federal

student aid programs based on its violations of federal law and their PPAs.

## III.    DEFENDANTS' FALSE STATEMENTS AND MISREPRESENTATIONS REGARDING COMPLIANCE WITH MINIMUM HOUR REQUIREMENTS

85.     As explained above, CTU and AIU are required to submit an Application for

Approval to Participate in the Federal Student Financial Aid Programs.  And following their

initial certification, they need to re-apply for certification at least every six years.  CTU and AIU

most recently submitted recertification applications in 2018.

86.     In these applications, CTU and AIU identified the number of credit hours required

for each program for which they wished to be eligible for federal student aid.  In doing so, CTU

and AIU represented that their course offering satisfied the minimum required learning hours

consistent with the federal credit hour definition in 34 C.F.R. § 600.2—meaning that for each

credit hour, students completed an amount of work that reasonably approximated at least one

hour of classroom or direct faculty instruction and two hours of out of class work each week.

87.     CTU and AIU's representations regarding these credit hour requirements were

false because CTU and AIU fail to provide anywhere near the required credit hours under the

federal definition.  For example, in certifying that a program requires 180 credit hours (as most

of CTU's bachelor programs do), CTU represented that students will receive and complete 5,400 hours of educational coursework.  As detailed above, however, CTU actually provides nowhere near the amount of educational instruction necessary to satisfy the credit hour assignments it reported to DOE.

88.     If DOE knew that CTU and AIU misrepresented the amount of academic instruction provided to their students through these false credit hour representations on their Applications for Approval to Participate in the Federal Student Financial Aid Programs, DOE would not have certified them for continued participation in the Title IV programs and would have denied their claims for federal financial aid.

89.     After fraudulently obtaining eligibility, CTU and AIU entered into PPAs with DOE.  In each PPA, CTU and AIU certified that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."  Each PPA also expressly conditioned CTU and AIU's participation in and payment under Title IV programs on its compliance with all statutory and regulatory provisions under Title IV, including the credit hour requirements.

90.     If DOE knew that CTU and AIU did not comply with the credit hour requirements under the Title IV programs, it would not have entered into a PPA with either school.  As a result, CTU and AIU would have been excluded from the Title IV programs, and DOE would have denied their claims for federal financial aid.  Instead, CTU and AIU fraudulently induced DOE to enter PPAs by omitting material information about their credit hour failures and falsely certifying compliance with all statutory and regulatory provisions under Title IV.  Because of this fraudulent inducement, CTU and AIU's subsequent claims for payment under those PPAs were false and fraudulent.

27

91.     Furthermore, CTU and AIU falsely certified their ongoing compliance with the terms of the PPA.  Before drawing down funds in the G5 system, CTU and AIU had to certify that their Title IV "funds are being expended . . . for the purpose and condition of the [PPA]." Unless schools submit this express certification of compliance with their PPAs, they cannot receive any funds through the G5 system.  If DOE knew that CTU and AIU's G5 certifications were false because CTU and AIU failed to comply with the Title IV credit hour requirements incorporated into their PPAs, DOE would not have released student aid payments to either school.

92.     Finally, in submitting claims for payment through the COD system, schools must identify a student's enrollment status, which intrinsically represents the number of federally defined credit hours provided to the student.  Federal regulations define a full-time student as receiving at least 12 credit hours per quarter; a three-quarter-time student as receiving 9 credit hours per quarter; a half-time student as receiving 6 credit hours per quarter; and a less-than-half-time student as receiving less than 6 credit hours per quarter.

93.     DOE relies on a school's representations regarding a student's credit hours when it determines whether and how much to pay in student aid.  For example, a student enrolled full time (i.e., more than 12 credit hours) receives twice as much Pell Grant aid as a student enrolled half-time.  And students enrolled less than half time (i.e., receiving less than 6 credit hours) are ineligible for Direct Loans altogether.

94.     If DOE knew that the enrollment statuses reported by CTU and AIU through the COD system were based on false and inflated credit hour assignments, it would not have made Title IV payments to CTU and AIU.

95.     Because CTU and AIU have failed to provide the required minimum credit hours for virtually every course that uses Intellipath, the vast majority of their students have not received an amount of educational content necessary to justify their enrollment status reported by CTU and AIU through the COD system.  If DOE knew the truth, it would not have paid CTU or AIU any Title IV aid for these students, or at a minimum, it would have reduced the Title IV aid it paid to reflect only the legitimate credit hours of instruction provided to those students.  This would have dramatically reduced the Pell Grant awards paid to CTU and AIU and rendered most of their students ineligible for Direct Loans altogether.

## IV.     RELATOR'S EFFORTS TO REPORT AND STOP THE FRAUD

96.     In or around May 2019, Lizbeth Nunez, Program Development Administrator at CTU, was working to transfer the CAWs to a new database called "CourseTune."  During this process, Ms. Nunez took it upon herself to verify Intellipath data for Math 102 and Math 106, two courses CTU had recently updated and for which Relator was the course owner. During the process, Ms. Nunez reached out to Relator to review Math 102 and Math 106 CAWs, stating that the learning hour calculations were far below the required minimum hours.  Relator reached out to Ms. Komar and Perdoceo's (then CEC) Vice Provost of Technology, Lisa Morrison, in an attempt to investigate the issue.  Through this interaction, Relator discovered the calculations on the CAWs significantly overstated the actual time spent on Intellipath for these courses.  Ms. Nunez continued transferring CAWs to CourseTune without verifying Intellipath data for any other courses.

97.     Relator assumed Dr. Johnson was unaware the Intellipath hours were inflated and immediately alerted her to the issue.  Dr. Johnson was unfazed.  She dismissed Relator's

concerns, saying "yes, saw that in the sheet. Thanks for following up."  Dr. Johnson subsequently rebuffed several efforts by Relator to discuss the issue.

98.     A short time later, on June 5, 2019, in an email to Relator, Ms. Morrison noted that she could not recreate the number of Intellipath hours reported on various CAWs without "manipulat[ing]" the data.  Relator realized the Intellipath calculation issue was widespread and requested another meeting with Dr. Johnson to present her concerns.

99.     After repeated requests, Dr. Johnson finally agreed to meet with Relator where Relator confronted her with the fact that CTU is inflating hours for every course with Intellipath (the vast majority of CTU's offerings), in every college in the university.  Dr. Johnson again dismissed Relator's concerns.  She sternly instructed Relator to refrain from amending any CAWs, and shortly after the meeting, removed Relator from all work, projects, and meetings regarding the CAWs, including creating or reviewing CAWs for new courses under Relator's purview.

100.    On September 11, 2019, Relator spoke with Dr. Ruth Tarantine, the Dean of the College of Nursing, regarding the conversations with Dr. Johnson relating to the inaccuracy of Intellipath calculations.  Dr. Tarantine was extremely troubled by this information, particularly given that many courses she created in the nursing program use Intellipath.  A few months later, on November 4, 2019, Dr. Tarantine told Relator that she too raised her concerns with Dr. Johnson, but Dr. Johnson expressed having "no appetite" for discussions regarding the way Intellipath hours are calculated.  Dr. Tarantine told Relator to "let it go."  Shortly after, Dr. Johnson appointed Dr. Tarantine Vice Provost of Curriculum (replacing Dr. Malekpour).

101.    After several more months of raising concerns, to no avail, Relator raised the issue with Dr. Amy Sloan, former Program Chair of COGEP, who by that time had been

promoted to COGEP Dean.  Dr. Sloan carried out many of Dr. Johnson's directives without

question.  Like Dr. Johnson, Dr. Sloan ignored Relator's concerns.  A few days later, in an effort

to silence Relator, Dr. Johnson and Dr. Sloan stripped Relator of most of Relator's job

responsibilities.  On September 8, 2020, Dr. Sloan told Relator that Dr. Johnson instructed her

"not to assign [Relator] any projects that extend past November."  In early November 2020,

Relator resigned from CTU.

*      *      *

102.    Defendants' financial aid fraud has been extremely profitable for them.  Relator

estimates that this long-running scheme involves the vast majority of CTU and AIU

undergraduate course offerings, along with a sizeable percentage of their graduate and specialty

courses.  This misconduct has occurred since at least Perdoceo's introduction of Intellipath at

CTU and AIU in 2012 and continues to this day.  It has resulted in Defendants obtaining several

hundred million dollars in federal financial aid they did not qualify for and were ineligible to

receive.  It also has resulted in tens of thousands of CTU and AIU students receiving a

substandard education or failing to complete their secondary education at all, precisely the type

of adverse outcome the minimum credit hour requirements are supposed to prevent.

## CLAIM FOR RELIEF

103.    Relator Fiorisce LLC realleges and incorporates by reference all of the allegations

set forth herein.

104.    This is a claim for treble damages and penalties under 31 U.S.C. § 3729(a)(1)(A)

and 31 U.S.C. § 3729(a)(1)(B).

105.    As set forth above, in violation of 31 U.S.C. § 3729(a)(l)(A), Perdoceo, CTU and

AIU have knowingly presented or caused to be presented false or fraudulent claims for payment

or approval by (i) submitting to the United States requests for Federal Pell Grants and Federal Direct Loans while knowingly failing to meet the minimum credit hour requirements that serve as both a condition of payment and participation under Title IV; (ii) making false certifications and statements regarding their compliance with the credit hour requirements in the Title IV programs in grant and loan Origination Records submitted through COD system and through draw-down requests in the G5 system; and (iii) making false certifications and statements regarding their compliance with the credit hour requirements in their various other Title IV applications and participation documents, including their PPAs and their Applications for Approval to Participate in the Federal Student Financial Aid Programs.

106.    In addition, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B), Perdoceo, CTU and AIU knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim by (i) creating false credit ascription documents with inflated Intellipath times that made it appear learning hours met Title IV credit hour requirements; and (ii) relying on their falsified credit ascription documents to report false credit hours for their programs in their various Title IV certifications, applications, and participation documents.

107.    Likewise, in violation of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B), Perdoceo, CTU and AIU fraudulently induced DOE to enter into PPAs by falsely certifying or representing that they had complied with all statutory and regulatory requirements governing a school's participation in Title IV programs, including the credit hour requirements, and by omitting material facts regarding their failure to provide minimum learning hours for the majority of their courses. Because of this fraudulent inducement, CTU and AIU's subsequent claims for payment under those PPAs were false and fraudulent.

108.    These false claims, records, statements, and certifications were material to the government's payments of Federal Pell Grants and loans under Title IV.  Had the government known that Perdoceo, CTU and AIU provided students with a fraction of the minimum learning hours required under the Title IV programs, it would have had a natural tendency to influence or been capable of influencing the government's decision to approve loans and provide financial aid.  Indeed, the government would not have made payment at all and would have terminated Defendants from continuing to participate in any Title IV programs.

**PRAYER FOR RELIEF**

WHEREFORE, Relator Fiorisce LLC requests the following relief:

A.    Declaring that Perdoceo, CTU and AIU's practices and conduct have violated the federal False Claims Act, 31 U.S.C. §§ 3729-3733.

B.    Enjoining and restraining Perdoceo, CTU and AIU from engaging in any conduct, contract or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

C.    Directing that Perdoceo, CTU and AIU, pursuant to 31 U.S.C. §§ 3729 *et seq*., pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions;

D.    Directing that Perdoceo, CTU and AIU, pursuant to 31 U.S.C. §§ 3729 *et seq*., pay the maximum penalty provided under 31 U.S.C. § 3729(a), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the regulations thereunder at 28 C.F.R. § 85.5, for each violation of 31 U.S.C. § 3729(a);

E.      Directing that Relator Fiorisce LLC receive the maximum award allotted by 31 U.S.C. § 3730;

F.      Directing that Perdoceo, CTU and AIU pay Relator Fiorisce LLC's costs, including attorneys' fees as provided by law;

G.      That this Court award pre- and post-judgment interest on any damages awarded to the United States or Relator;

H.      Directing such other equitable relief as may be necessary to redress Perdoceo, CTU and AIU's violations of the United States law; and

I.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Relator hereby demands a trial by jury.

Dated:  February 24, 2021

CONSTANTINE CANNON LLP

s/ Marlene Koury
Marlene Koury
Harry Litman
Christopher McLamb
CONSTANTINE CANNON LLP
150 California Street, Suite 1600
San Francisco, CA 94111
Tel: (415) 639-4001
Fax: (415) 639-4002
mkoury@constantinecannon.com
hlitman@constantinecannon.com
cmclamb@constantinecannon.com

Gordon Schnell
CONSTANTINE CANNON LLP
335 Madison Avenue, Floor 9

New York, NY 10017
Tel: (212) 350-2700
Fax: (212) 350-2701
gschnell@constantinecannon.com

*Counsel for Relator*