UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES ex rel. FIORISCE LLC, | Civil Action No.  1:21-cv-00573-RBJ |
| Plaintiff, | <u>To Be Filed <i>in Camera</i> and Under Seal</u> |
| v. | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT** |
| PERDOCEO EDUCATION CORPORATION; COLORADO TECHNICAL UNIVERSITY, INC.; AMERICAN INTERCONTINENTAL UNIVERSITY, INC.; | |
| Defendants. | |

Relator Fiorisce LLC ("Relator") brings this *qui tam* action on behalf of the United States against Perdoceo Education Corporation ("Perdoceo") and its subsidiaries, Colorado Technical University ("CTU") and American InterContinental University ("AIU"), (collectively, "Defendants") under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and alleges as follows:

## INTRODUCTION

1.      This case is about Defendants' long-running scheme to extract hundreds of millions of dollars each year from the United States by securing federal financial aid money for educational services at Perdoceo's for-profit universities, CTU and AIU, that did not qualify for federal funding.

2.      Defendants' scheme centers on their widespread, intentional failure to provide their students with anywhere near the amount of educational content—measured in "credit hours"—required under federal student aid programs. Defendants provide only a fraction of the required content so they can maximize student retention and keep financial aid money flowing into their coffers.

3.      In 2011, the Department of Education ("DOE") established a federal definition of "credit hour" to ensure taxpayer dollars on student aid were spent wisely and equitably among institutions of higher education. Under this definition, for each course credit hour, a school must provide educational content that approximates at least one hour of classroom instruction and two hours of out of class work each week for a minimum of ten weeks, or the equivalent number of learning hours over a different period of time.[1] Thus, for a 4.5 credit hour course, a school must provide at least 135 learning hours of educational content. If it does not provide this minimum content, the school does not qualify to receive financial aid.

4.      For years, CTU and AIU have purposely evaded these strict financial aid requirements and failed to provide anywhere near the educational content required. Instead, they have shortchanged hundreds of thousands of students by designing courses with fewer than 20 hours of educational content—much less 135—and delivering those courses through Perdoceo's "Intellipath" proprietary online-learning platform. With Intellipath, even if students complete every assignment in a course, they receive nowhere near the amount of educational content required for federal aid.

5.      In addition to the lack of content, Defendants intentionally designed Intellipath to further minimize the hours students spend to complete CTU and AIU courses. Intellipath's "Determine Knowledge" feature is one of the ways Defendants accomplished this result, automatically skipping students through significant portions of course work by having them pass

---

[1] Learning hours are also referred to as "course work," "clock-hours," "contact hours," "time-on-task," and "learning activities."

rudimentary diagnostic tests. Defendants have employed various other machinations with Intellipath similarly causing students to bypass lessons as they moved through their courses.

6.      In an effort to conceal the minimal course work Defendants provide and the stratagems they employ to quickly funnel students through their courses, Defendants have misrepresented data from the Intellipath platform to vastly overstate the number of learning hours these courses contain so they appear to meet the federal credit hour requirements for financial aid.

7.      Defendants then use these falsified learning hour calculations to support its assignment of credit hours and its claims for payment under the federal student aid programs to which they would not otherwise be entitled. The United States relies on Defendants' assignment of credit hours for each course when determining their eligibility for student aid programs and the amount of aid the government awards and ultimately pays. Had the United States known that Defendants have deliberately failed to provide the required educational content, made false statements and records in furtherance of their scheme, and failed to meet the federal credit hour requirements, the government would not have paid them and would have suspended or terminated them from financial aid eligibility altogether.

8.      Relator brings this action to stop Defendants from continuing to engage in this fraudulent activity and to recover on behalf of the United States the hundreds of millions of dollars it has paid Defendants in student aid for which they did not qualify. Relator also brings this action to stop Defendants from continuing to victimize the hundreds of thousands of primarily low-income, disadvantaged students who have received just a fraction of the educational services they enrolled in CTU and AIU to receive and which the government paid these universities to provide.

## PARTIES

9.      Through its principal, Relator Fiorisce LLC has firsthand knowledge of the fraud alleged herein. Relator began working at CTU as a Lead Faculty member in the College of General Education and Psychology ("COGEP"). Relator's last position at CTU was COGEP University Program Director. Through Relator's work, which included supervising and mentoring other faculty and overseeing their instructional approaches, Relator had a direct window into Defendants' fraudulent scheme and its impact on student education. Relator repeatedly tried to stop the wrongdoing, raising concerns with the most senior members of CTU's administration. Unsuccessful in these efforts, Relator was ultimately pressured to leave CTU.

10.     Perdoceo is a Delaware Corporation with its principal place of business in Schaumburg, Illinois. Originally operating under the name Career Education Corporation ("CEC"), Perdoceo rebranded under its present name on January 1, 2020, following a decade of public scandals and state enforcement actions (unrelated to the conduct at issue here).

11.     Perdoceo wholly owns and operates CTU and AIU. CTU is a Colorado corporation with its principal place of business in Schaumburg, Illinois. CTU operates two campuses in Colorado, one in Aurora and the other in Colorado Springs. It also operates online degree programs nationwide. CTU currently has over 24,000 students enrolled in its online, undergraduate degree programs and 3,400 in its graduate programs. CTU offers programs in General Education, Business, Computer Science and Technology, Nursing, and Engineering, among others. The vast majority of CTU students receive federal financial aid.

12.     As a for-profit college, CTU is classified as a "proprietary institution of higher education" under federal law. 34 C.F.R. § 600.5(a).

4

13.     Since at least 2011, CTU has operated under a Program Participation Agreement ("PPA") with DOE that authorizes its participation in federal student aid programs under Title IV of the Higher Education Act of 1965. DOE most recently renewed CTU's PPA in May 2019, effective through March 31, 2021. On December 21, 2020, CTU applied for recertification to continue participation in Title IV Programs, but DOE has not yet renewed CTU's PPA and continues to review its application for recertification.

14.     AIU is a Georgia corporation with its principal place of business in Schaumburg, Illinois. AIU Online, LLC, operates for-profit colleges at physical campuses in Atlanta, Georgia and Houston, Texas, as well as through online degree programs nationwide. AIU offers programs in General Education, Business, Healthcare, and Criminal Justice, among others. The vast majority of AIU students receive federal financial aid.

15.     As a for-profit college, AIU is classified as a "proprietary institution of higher education" under federal law. 34 C.F.R. § 600.5(a).

16.     Since at least 2011, AIU has operated under a PPA with DOE that authorizes its participation in federal student aid programs under Title IV of the Higher Education Act of 1965. DOE most recently renewed AIU's PPA in May 2019, effective through March 31, 2021. Effective November 5, 2020, AIU adopted a "university system" model, named the American InterContinental University System ("AIUS"), which is now comprised of three universities: AIU, Trident University International, and CalSouthern. On December 21, 2020, AIUS applied for recertification to continue participation in Title IV Programs, but DOE has not yet renewed AIU's PPA and continues to review its application for recertification.

17.     Although CTU and AIU maintain physical campuses, more than 90 percent of their students are enrolled in fully online academic programs. CTU and AIU's online programs

are asynchronous, meaning an instructor provides class materials and assignments that students complete on their own schedules. This asynchronous instruction is primarily delivered through Perdoceo's Intellipath online learning platform.

18.     CTU and AIU's retention rates for their online undergraduate programs—measuring students who continue past freshman year—are among the worst in the country. CTU's most recently reported retention rates between 2018-2020 were as low as 25 percent for part-time students and 46 percent for full-time students; AIU's most recently reported retention rates for that same period are between zero for part-time students and 28 percent for full-time students. Graduation rates for both schools are also extremely low, around 25 percent for CTU and around 12 percent for AIU.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1345, 1367(a).

20.     This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants transact business or are found in the District.

21.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Defendants regularly conduct and/or conducted business within the District, maintained employees and offices in this District, and, as a result of the statutory violations alleged herein, submitted false claims and/or caused false claims to be submitted in this District.

22.     Under 31 U.S.C. § 3730(e)(4)(A) there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this complaint. To the extent there has been any such public disclosure, Relator meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B).

## BACKGROUND

I.    **FEDERAL FUNDING UNDER TITLE IV OF THE HIGHER EDUCATION ACT**

23.    Through Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, Congress enacted several student loan and grant programs to provide financial assistance to students seeking post-secondary education. The two at issue in this case are the Federal Pell Grant Program and the Federal Direct Loan Program.

24.    The Pell Grant Program provides federal funds to assist undergraduate students with demonstrated financial need. 20 U.S.C. § 1070(a); 34 C.F.R. § 690.1. As the name implies, Pell Grants are not loans. Students have no obligation to repay a Pell Grant absent unusual circumstances. For award year 2020-21, the maximum Pell Grant award was $6,345, with the actual award amount depending on the student's cost of attendance, expected family contribution, and enrollment status (full-time or part-time). Over the past few years alone, CTU and AIU students have collectively received hundreds of millions of dollars in Pell Grants—money that flows directly to CTU, AIU, and ultimately Perdoceo.

25.    In addition, through the Direct Loan Program, DOE makes subsidized and unsubsidized loans directly to eligible students and parents to help cover the cost of attendance at an eligible school. 34 C.F.R. § 685.101(b)(1). For Subsidized Direct Loans, DOE pays the interest on a student's loan while they remain enrolled at least half-time, for the first six months after they leave school, and during any period of deferment. Over the past few years alone, CTU and AIU students have collectively received hundreds of millions of dollars in federal loans that flow directly to CTU, AIU, and ultimately Perdoceo. A sizeable portion of these loans have not been repaid, a natural consequence of the substandard education CTU and AIU provide and the extremely low graduation rates that follow.

7

26.     To receive this Title IV funding, schools must first complete an Application for Approval to Participate in the Federal Student Financial Aid Programs through the Electronic Application for Program Participation. 34 C.F.R. § 668.13(a). And at least every six years, schools must submit a new application to recertify their participation in and eligibility for Title IV programs. 34 C.F.R. § 668.13(b).

27.     In the Application for Approval to Participate in the Federal Student Financial Aid Programs, the president, CEO, or chancellor of each school must certify:

> [T]o the best of my knowledge and belief, all information in this document is true and correct. I understand that if my institution provides false or misleading information, (a) the U.S. Department of Education may deny the institution's request for eligibility to participate in federal student financial aid programs and/or revoke eligibility once it has been granted and (b) the institution may be liable for all federal student financial aid funds it or its students received.

28.     If DOE accepts the application, the school must then enter into a PPA with DOE before receiving any Title IV funds. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14. Each PPA expressly conditions a school's eligibility for federal funds on compliance with all statutory and regulatory provisions under Title IV, including meeting the credit hour requirements.

## II.     FEDERAL CREDIT HOUR DEFINITION

29.     Credit hours are used to determine the eligibility of an institution and its educational programs for participation in Title IV programs, and to determine the eligibility of a student for Title IV assistance and the amount of the student's assistance. DOE provides Title IV funding to colleges only for educational programs and enrolled students that meet specific credit

hour requirements. Credit hours reflect the amount of educational content, also known as "learning hours," involved in completing a course.

30.     In 2010, DOE promulgated regulations that define a "credit hour" as:

[A]n amount of work represented in intended learning outcomes and verified by evidence of student achievement that is an institutionally established equivalency that reasonably approximates not less than—

> (1) One hour of classroom or direct faculty instruction and a minimum of two hours of out of class student work each week for approximately . . . ten to twelve weeks for one quarter hour of credit, or the equivalent amount of work over a different amount of time; or

> (2) At least an equivalent amount of work as required in paragraph (1) of this definition for other academic activities as established by the institution including laboratory work, internships, practica, studio work, and other academic work leading to the award of credit hours.

Program Integrity Issues, 75 Fed. Reg. 66832, 66946 (Oct. 29, 2010) (codified at 34 C.F.R. § 600.2 (2011)).[2]

---

[2] DOE amended this regulation as of July 1, 2021, leaving intact the core requirement that a school provide a minimum number of learning hours per credit: "[A] credit hour is an amount of student work defined by an institution, as approved by the institution's accrediting agency or State approval agency, that is consistent with commonly accepted practice in postsecondary education and that (1) Reasonably approximates not less than (i) One hour of classroom or direct faculty instruction and a minimum of two hours of out-of-class student work each week for approximately . . . ten to twelve weeks for one quarter hour of credit, or the equivalent amount of work over a different period of time; or (ii) At least an equivalent amount of work as required in paragraph (1)(i) of this definition for other academic activities as established by the institution, including laboratory work, internships, practica, studio work, and other academic work leading to the award of credit hours; and (2) Permits an institution, in determining the amount of work associated with a credit hour, to take into account a variety of delivery methods, measurements of student work, academic calendars, disciplines, and degree levels." 34 C.F.R. § 600.2.

31.     DOE established this federal credit hour definition to curb "abuse" and inconsistent treatment of federal funds spent on Title IV programs. 75 Fed. Reg. 34806, 34811 (June 18, 2010). Specifically, in defining a credit hour, DOE stated that a "standard measure will provide increased assurance that a credit hour has the necessary educational content to support the amounts of Federal funds that are awarded to participants in Federal funding programs and that students at different institutions are treated equitably in the awarding of those funds." 75 Fed. Reg. 66844.

32.     On March 18, 2011, DOE published additional guidance on these credit hour regulations. This guidance reiterated that the federal definition was designed to "address vulnerabilities in the student aid programs that leave them open to fraud and abuse" and "to safeguard taxpayer funds." U.S. Dep't of Educ., Gen-11-06, Guidance to Institutions and Accrediting Agencies Regarding a Credit Hour as Defined in Final Regulations Published on October 29, 2010, at 1 (Mar. 18, 2011). And it further emphasized that the federal credit hour definition applies equally to the asynchronous online learning at issue here: "An institution that is offering asynchronous online courses would need to determine the amount of student work expected in each online course in order to achieve the course objectives, and to assign a credit hour based on at least an equivalent amount of work as represented in the definition of credit hour." *Id*. at 6.

## III.     FEDERAL CREDIT HOURS AND ELIGIBILITY UNDER TITLE IV

33.     The federally defined credit hour provides "a quantifiable, minimum basis for a credit hour that, by law, is used in determining eligibility for, and the amount of, Federal program funds that a student or institution may receive." 75 Fed. Reg. 66845. At the institutional level, for-profit schools like CTU and AIU must qualify as "eligible institutions" providing

10

"eligible programs" to participate in Title IV funding for those programs. 34 C.F.R. § 600.2 (defining "eligible institution"); *id.* § 600.5(a)(5)(i)(A). Likewise, students must be enrolled in an eligible program at an eligible institution to obtain assistance under Title IV. 34 C.F.R. § 668.32(a)(1)(i).

34.     For undergraduates, the HEA defines an "eligible program" as requiring at least 24 credit hours of academic instruction, unless the student has already obtained an associate degree, in which case 12 credit hours must be provided. 20 U.S.C. § 1088; *see also* 34 C.F.R. § 668.8(d)(1)(ii). Schools confirm compliance with this requirement by reporting the number of credit hours required for each of their eligible programs as part of their Application for Approval to Participate in the Federal Student Financial Aid Programs.

35.     Under several Title IV programs, including the Direct Loan Program, students must be enrolled on at least a half-time basis to receive federal aid. 34 C.F.R. §§ 668.32(a)(2), 685.200(a)(1)(I). Accordingly, students enrolled at AIU or CTU must carry an academic workload equal to at least 6 federally defined credit hours per quarter to participate in the Direct Loan Program.

36.     A student's enrollment status also determines the amount of financial assistance they receive under the Pell Grant Program. Each year, the Secretary of Treasury publishes a "Payment Schedule" and "Disbursement Schedule" for the Pell Grant Program outlining the grant amounts that students will receive for the coming award year. 34 C.F.R. §§ 690.2, 690.62, 690.63(b). The Payment Schedule provides the grant amounts for full-time students, while the Disbursement Schedule does so for three-quarter-time, half-time, or less-than-half-time students.

37.     The Pell Grant amounts set out in the Payment Schedule and Disbursement Schedule are prorated based on enrollment status. A half-time student will receive half the grant

11

amount of a similarly situated full-time student, while a three-quarter-time student will receive three-fourths of the full-time amount. Students enrolled less than half-time receive one-fourth of the full-time amount.

38.     As these rules make clear, credit hour assignments determine Title IV eligibility and award amounts. Accordingly, schools are responsible for ensuring that the credit hours they ascribe to courses reflect the required amount of learning hours and educational content under the federal definition. If a school fails to meet credit hour requirements, DOE may force the school to repay the Title IV funds, levy fines, and limit, suspend, or terminate its participation in Title IV programs altogether.

## IV.     CERTIFICATIONS AND CLAIMS FOR PAYMENT UNDER TITLE IV

39.     For all Title IV programs, the disbursement of federal funds depends on a school's statements and certifications of compliance with various Title IV requirements, including representations regarding the number of credit hours provided to students.

40.     Under both the Pell Grant and Direct Loan programs, a student initiates the application process by submitting a Free Application for Federal Student Aid ("FAFSA") to DOE. Among other things, this allows DOE to calculate an expected family contribution for Pell Grant recipients. 34 C.F.R. § 690.12(a).

41.     DOE then sends the student's application information and expected family contribution back to the student on a Student Aid Report ("SAR") and to schools selected by the student on an Institutional Student Information Record ("ISIR"). 34 C.F.R. § 690.13. A student seeking a Direct Loan must also complete a Master Promissory Note ("MPN") and submit the MPN to the school. 34 C.F.R. § 685.201.

12

42.     Parents may also obtain a Parent PLUS loan through the Direct Loan Program to help pay tuition and other related costs of education for their children. 34 C.F.R. §§ 682.102(d), 685.200(c). A parent borrower commences the loan process by completing and submitting a Direct PLUS MPN for a Parent Direct PLUS loan. 34 C.F.R. § 685.201(b).

43.     The school then uses the information provided in the SAR, ISIR, and MPN to determine the student's eligibility under the Title IV programs. The school presents the student with a "financial aid package" that may include Pell Grants, Direct Loans, or Campus-Based Aid (which includes Federal Supplemental Educational Opportunity Grants and Federal Work-Study), as well as other scholarships or aid for which the student may be eligible.

44.     In doing so, schools are required to determine a student's enrollment status—full-time, three quarter-time, half-time, or less—and the corresponding Pell Grant award is based on that enrollment status, the program's cost of attendance, and the student's expected family contribution. 34 C.F.R. § 690.63. After calculating a student's Pell Grant disbursement amount, schools must electronically transmit the student's Pell Grant disbursement data to DOE. 34 C.F.R. § 690.61.

45.     Likewise, schools must determine a student's eligibility for the Direct Loan Program, as well as the amount of each type of loan (subsidized or unsubsidized) that the student is eligible to receive. 34 C.F.R. § 685.301(a)(4), (5). As noted above, students must be enrolled at least half-time to participate in the Direct Loan Program. 34 C.F.R. §§ 685.200(a)(1)(i), 668.32(a)(2).

46.     If the student accepts a Pell Grant or Direct Loan, the school requests payment from DOE through an electronic "origination" record—called a "Common Record"—that it submits through an electronic database called the Common Origination and Disbursement

13

("COD") System. The school must ensure that all information submitted to the COD system is complete and accurate. 34 C.F.R. § 685.301(a)(1). Among other things, the Common Record includes the school's determination of the student's enrollment status, award amount, and disbursement dates and amounts.

47.     If the information submitted by the school on the COD System is consistent with Title IV program requirements and the student's SAR and ISIR, DOE will make payment on the Common Record claim submitted through the COD System by making funds available for the school to electronically draw down through a system known as "G5."

48.     Before drawing down funds in the G5 system, schools must certify that the "funds are being expended . . . for the purpose and condition of the [PPA]." Unless schools submit this express certification of compliance, which imbeds the PPA's requirement that the school comply with all Title IV requirements, including meeting the federal credit hour requirements, they cannot receive any funds from Title IV programs. In this way, the credit hour requirements are for participating schools both a condition of payment under and a condition of participation in all Title IV funding programs.

## V.     INTELLIPATH EDUCATION TECHNOLOGY

49.     Intellipath is Perdoceo's self-branded, proprietary education technology that CTU and AIU have used in their scheme to secure Title IV funding for which they do not qualify. Perdoceo licenses Intellipath from CCKF, d/b/a Realizeit, a Delaware company with a primary business address of 220 North Smith Street, Suite 228, Palatine, IL 60067 (CCKF also has offices in Dublin, Ireland and New York, NY). Perdoceo is a major investor in Realizeit, and Realitzeit's leadership is largely comprised of former Perdoceo executives. Realizeit CEO Manoj Kulkarni is the former Chief Technology and Innovation Officer at Perdoceo's predecessor CEC.

14

Realizeit VP for Client Success Prabhu Balashanmugamand and Realizeit Chief Sales, Marketing & Strategy Officer Ty Robert also had leadership roles at CEC prior to joining Realizeit. Perdoceo's Vice President of Educational Technology, Judith Komar, played a key role in designing Intellipath. She also oversees its use at CTU and AIU.

50.     CTU and AIU have marketed Intellipath as an adaptive learning platform that purportedly provides a "personalized" learning path in each course for every student. They claim Intellipath streamlines the learning process by skipping material students already know and focusing them on what they need to learn. In truth, Defendants have designed Intellipath to bypass most of the course material, meager as it is. One key way Defendants have accomplished this is through "Determine Knowledge," a diagnostic test students take at the start of each unit (there are typically five per course) to ostensibly evaluate their prior knowledge of the material in the unit. Defendants created the tests to be overly simplistic so students could readily pass them and then automatically skip the majority of lessons (if not all the lessons) in each unit. Defendants also have employed other programing designs with Intellipath to similarly bypass various lessons as students move through the course, including "backfilling" lessons, where once a student completes a lesson—no matter where it is in the unit—Intellipath marks prior lessons in the unit as complete. Students never make up the missing hours and content of these bypassed lessons and Defendants do not provide any replacement content to make up for the shortfall.

51.     Defendants' real purpose for Intellipath is to push students through their courses in the shortest amount of time possible without any regard for the educational content the students receive or the minimum learning hours CTU and AIU are required to provide. For Defendants, Intellipath has nothing to do with improving the education process. It is simply about maximizing student retention and the Title IV funding that comes with it.

15

52.     Defendants designed Intellipath as an educational shortcut by providing students with woefully deficient course content and steering students through the content in the shortest amount of time possible. Defendants then count towards the minimum learning hours required under federal credit hour requirements all the content missing from the course and that Intellipath directs students to avoid. Defendants do this all for the purpose of making it virtually effortless for students to take and pass courses, and ultimately stay enrolled in school.

## DEFENDANTS' FRAUD IN SECURING TITLE IV FUNDING

## I.     DEFENDANTS' FAILURE TO MEET THE FEDERAL CREDIT HOUR REQUIREMENTS

53.     Virtually all of the CTU and AIU course offerings are 4 or 4.5 credit hours, which means to qualify for Title IV funding, these classes must include a minimum of 120 to 135 total learning hours, respectively. Over CTU and AIU's standard 5.5-week course period, this equates to Defendants providing education content that supports at least 27 learning hours per week. Defendants have not even come close. And with respect to the content they do provide, they have programmed Intellipath to skip students past large portions of it anyway.

54.     Defendants also remove content mid-stream if students are failing to complete lessons by deleting entire lessons in Intellipath, re-writing or deleting end-of-lesson questions, and removing outside assignments. In addition, Defendants set a very low "threshold" for passing Intellipath lessons (generally between 40 and 55 percent), allowing students to pass classes with what would be a failing grade anywhere else. This is all to encourage students to remain enrolled by making coursework virtually effortless.

55.     Directed by Ms. Komar and Perdoceo's other senior leadership, CTU Provost Dr. Connie Johnson has been the primary driver of the scheme at CTU, with her singular aim to

maximize student retention—and financial aid money—at any cost. CTU administrators openly assisting Ms. Komar and Dr. Johnson in this fraud have included CTU's former COGEP Dean, Dr. Amy Sloan, former Vice Provost Dr. Douglas Stein, and former COGEP Dean Dr. Tonya Troka, among others. All of them have been complicit in CTU's pervasive failure to provide the minimum required learning hours to CTU's students for years. They also have acted to cover-up this fraud by falsifying "credit ascription" documents to inflate the amount of hours CTU ascribes or allocates to Intellipath content.

56.    CTU maintains various documents that reveal the paltry amount of content in each course. Two such documents are the course "Lesson Guides," which identifies all the course content within Intellipath, and "Instructor Guides," which identify lessons within Intellipath and outside Intellipath, if any, such as discussion boards, textbooks, articles, or videos. As these and other documents make clear, for CTU's online courses, the vast majority of content is limited to Intellipath. And even when outside content is provided, it is largely for show, to artificially boost the credit ascription hours. There are no written assignments connected to these "for show" materials. Nor is the content tested, discussed, or even graded.[3]

57.    CTU's "Content Exports" similarly reflect the minimal course content CTU provides. These documents are supposed to detail all the content CTU provides through Intellipath, including lessons, embedded videos, and end-of-lesson questions. Relator's analysis of Content Exports for high-enrollment courses reveals that CTU provides students between 10 and 20 hours of total content. This analysis was performed using well-established, industry

---

[3] In many cases, these extra materials are already included in Intellipath and are thus double counted for credit ascription. In addition, CTU misclassifies the level of difficulty of these materials to further inflate the estimated time in a course for credit ascription purposes (e.g., rather than 10 pages of introductory reading, CTU calculates 10 pages of "complex or technical" reading).

accepted reading rates (which are those used by CTU), along with actual running times for embedded videos, and time for reviewing and responding to questions.

58.     For example, in Sociology 102, a 4.5 credit course requiring 135 learning hours, CTU provided under 10 hours of Intellipath content, including all reading, videos, and questions. In its credit ascription documents, however, CTU allocated 116 of the required 135 learning hours to this Intellipath content. In another 4.5 credit hour course, University 104, CTU provided just 17 hours of Intellipath content, but allocated 120 hours to that same content. And, in Communications 102, CTU provided just 10 hours of Intellipath content, but allocated 90 hours to that content in its credit ascription documents. The minimal course content CTU provides and the wide disparity between the content CTU actually provides and the content CTU claims to provide extends to virtually all online courses that use Intellipath, which covers the vast majority of CTU's course offerings.

59.     The lack of content coupled with Intellipath's programming to bypass much of that content results in the overwhelming majority of students spending just 5 to 15 hours total on Intellipath. Failing to provide content is by design—Defendants want their students to spend as little time as possible on coursework to maximize their retention. Dr. Johnson and her group actively track the actual time spent by students to ensure it remains at low levels. They do this through an internal dashboard and various internal reports that document the actual time students spend on Intellipath, particularly for all the high-enrollment courses such as English, Math, University, History, Sociology, and Psychology, among others. These reports are available in various breakouts, including by student, instructor, course, or all sections of the same course (e.g., all sections of English 102 each year).

60.     Dr. Johnson and her group conceal the actual Intellipath times from other CTU personnel, and most importantly, from the government and CTU's accrediting agency, the Higher Learning Commission ("HLC"). Instead of accurately reporting these low numbers, CTU regularly ascribes an inflated 80 to 100 learning hours or more to Intellipath content to support its claimed compliance with federal credit hour regulations. CTU draws these inflated numbers from a handful of cherry-picked outlier students with abnormally high hours, often because they have made multiple attempts at the same course (which Intellipath treats as cumulative). Defendants then present those students as representative of the broader class population for learning hour calculations. What follows is just a sampling of this artifice from several CTU course offerings.

English 104 and 105

61.     English 104 and 105 are 4.5 credit hour courses requiring CTU to provide 135 learning hours for each course. For both classes, CTU certifies that these courses meet the credit hour requirements largely based on the roughly 100 hours of learning hours CTU attributes to Intellipath (CTU reporting the balance of the learning hours being made up by student participation in discussion boards and preparing a short final paper). However, according to the internal Intellipath reports available only to Dr. Johnson and her group, the actual student time on Intellipath for these classes falls far below the minimum learning hour requirements.

62.     For example, for the roughly 3,300 students who took English 104 in 2020, the average time spent on Intellipath was only around 6 hours. Specifically, the average time was 6 hours, 17 minutes for the 1,196 students who took this class in the first quarter; 5 hours, 35 minutes for the 1,112 students who took this class in the second quarter; and 5 hours, 51 minutes for the 1,039 students who took this class in the third quarter.

19

63.     For the roughly 5,800 students who took English 105 in 2020, the average time spent on Intellipath was less than 6 hours. Specifically, the average time was 5 hours, 58 minutes for the 2,061 students who took this class in the first quarter; 5 hours, 25 minutes for the 1,823 students who took the class in the second quarter; and 5 hours, 1 minute for the 1,896 students who took the class in the third quarter.

64.     English 104 reports broken out by individual student reveal the same significant learning hour shortfall. These student-level reports include the student's name, the total lessons the student completed in each unit, the average time the student spent on each lesson, the student's average score, the total number of lessons the student completed for the course, and the overall time the student spent on the course. As just one example, a student breakout in English 104 2003B shows the average time students spent on Intellipath was 4.9 hours.[4] Looking just to the first student listed on the corresponding report, excerpted below, the student spent 6.71 hours on Intellipath (93 lessons times 4.33 minutes weighted average for each lesson), completing every unit and finishing the course with an average score of 55 percent.

| Person | Objective (core) | Total lessc | Average time (mins) | Average score |
|---|---|---|---|---|
| ▮▮▮▮▮▮ | Unit 1: Extra Credit | 2 | 0.64 | 0% |
| | Unit 1: Starting Your Writing Jc | 36 | 4.57 | 56.52% |
| | Unit 2: Developing Your Introc | 9 | 6.15 | 40.56% |
| | Unit 2: Extra Credit | 2 | 0.06 | 0% |
| | Unit 3: Drafting Your Essay | 24 | 3.84 | 61.50% |
| | Unit 3: Extra Credit | 2 | 0.1 | 0% |
| | Unit 4: Extra Credit | 2 | 0.11 | 0% |
| | Unit 4: Revising Your Draft | 10 | 7.02 | 54.96% |
| | Unit 5: Your Final Essay | 6 | 3.14 | 37.50% |
| Total for ▮▮▮▮▮▮ | | 93 | 4.33 | 54.66% |

---

[4] "2003B" is session B, in Spring of 2020. For reference, the first two numbers following a course name reflect the year the course ran (e.g., "20" means 2020, "19" means 2019, and so forth). The next two numbers reflect the fiscal quarter in which the course ran, and the session is either A or B, both of which run concurrently each quarter.

65.     In a similar report for English 105 2003A, the average time students spent on Intellipath was 4.08 hours. Again, looking just to the first student listed on the corresponding report, the student spent just 1.57 hours on Intellipath (46 lessons times 2.05 minutes weighted average for each lesson), completing just three of the four units but passing the course with an average score of 80 percent.

| Person | Objective (core) | Total lessons | Average time ( | Average score |
|--------|------------------|---------------|----------------|---------------|
| ▮▮▮▮▮ | Unit 1: Extra Credit | 3 | 0.34 | 0% |
| | Unit 2: Extra Credit | 1 | 1.95 | 0% |
| | Unit 2: Writing and Resear | 9 | 3.22 | 76.79% |
| | Unit 3: Extra Credit | 4 | 0.25 | 0% |
| | Unit 3: Research and Refe | 26 | 1.85 | 81.55% |
| | Unit 4: Writing: Drafting a | 3 | 4.44 | 80.56% |
| Total for | ▮▮▮▮▮▮▮▮ | 46 | 2.05 | 80.03% |

University 104 and 201

66.     University 104 and 201 are 4.5 credit hour courses CTU also certifies meet the federal credit hour requirements largely based on the roughly 100 or more learning hours CTU attributes to student time on Intellipath. But according to the internal Intellipath reports, the average student time on Intellipath for these classes is just a few hours. For example, for the roughly 13,500 students who took UNIV 104 in 2020, the average time spent on Intellipath was roughly 5 hours. Specifically, the average time was 5 hours, 33 minutes for the 5,822 students who took this class in the first quarter; 5 hours, 18 minutes for the 5,197 students who took this class in the second quarter; and 5 hours, 13 minutes for the 2,958 students who took this class in the third quarter.

67.     The average student-level breakout for this class was 4.65 hours. Taking just the first student listed on the corresponding report, the student spent a mere 1.35 hours on Intellipath

(33 lessons times 2.45 minutes weighted average per lesson), completing every unit and passing the course with an average score of 86 percent.

| Person | Objective (core) | Total lessons | Average time (mins) | Average score |
|---|---|---|---|---|
| ▮ | Unit 1: Understanding and Navi | 16 | 2.11 | 92.97% |
| | Unit 1: Extra credit | 1 | 0.22 | 0% |
| | Unit 2: Successfully Integrating | 6 | 4.98 | 81.25% |
| | Unit 2: Extra credit | 1 | 0.18 | 0% |
| | Unit 3: Developing the Mindset | 2 | 2.14 | 75% |
| | Unit 3: Extra credit | 1 | 0.17 | 0% |
| | Unit 4: Strategies for Achieving | 2 | 1.08 | 28.57% |
| | Unit 4: Extra credit | 1 | 0.3 | 0% |
| | Unit 5: Financial Literacy | 2 | 4.92 | 87.50% |
| | Unit 5: Extra credit | 1 | 0.07 | 0% |
| Total for ▮ | | 33 | 2.45 | 86.24% |

68.     Similarly, in a breakout by student of University 201 2003B, the average time students spent on Intellipath was 5.82 hours. Taking the second student listed on the corresponding report,[5] the student spent only 6.72 hours on Intellipath (30 lessons times 13.44 minutes), completing every unit and passing with an average score of 88 percent.

| Person | Objective (core) | Total lessons | Average time (mins) | Average score |
|---|---|---|---|---|
| ▮ | Unit 1: Assessment: Know | 7 | 20.05 | 66.67% |
| | UNIV 201 Unit 1: Extra Cre | 2 | 2.96 | 0% |
| | Unit 2: Building Your Bran | 3 | 3.16 | 0% |
| | UNIV 201 Unit 2: Extra Cre | 1 | 53.7 | 0% |
| | Unit 3: Marketing Yourself | 9 | 11.64 | 91.67% |
| | UNIV 201 Unit 3: Extra Cre | 2 | 5.12 | 0% |
| | UNIV 201 Unit 4: Extra Cre | 2 | 3.94 | 0% |
| | Unit 5: Your Career Path a | 4 | 17.71 | 91.67% |
| Total for ▮ | | 30 | 13.44 | 87.50% |

---

[5] The first student completed no lessons, only extra credit, and had a score of zero.

Math 102

69.     Math 102 is a 4.5 credit course that again CTU certifies meets the federal credit hour requirements largely based on the learning hours CTU attributes to time spent on Intellipath. But again, the actual time students spend on Intellipath is significantly lower. In a breakout by student of Math 102 2003B, the average time students spent on Intellipath was 11.14 hours. Taking just the first student listed on the corresponding report, the student spent 7.37 hours on Intellipath (22 lessons times 20.1 minutes), finishing four units and passing with an average score of 97 percent.

| Person | Objective (core) | Total lessons | Average time (mins) | Average score |
|--------|------------------|---------------|---------------------|---------------|
| ▮▮▮▮ | Unit 2: Fractions, Ratio | 9 | 8.85 | 100% |
| | Unit 3: Decimals and P | 2 | 0 | 0% |
| | Unit 4: Application of I | 8 | 21.49 | 97.22% |
| | Unit 5: Linear Function | 3 | 63.54 | 94.44% |
| Total for ▮▮▮▮ | | 22 | 20.1 | 96.88% |

70.     Similarly, in a breakout by student of Math 102 1803B, the average time students spent on Intellipath was 10.14 hours. Taking the first student listed on the corresponding report, the student spent 10.08 hours on Intellipath (35 lessons times 17.28 minutes), finishing every unit and passing with an average score of 93 percent.

| Person | Objective (core) | Total lessons | Average time (mins) | Average score |
|--------|------------------|---------------|---------------------|---------------|
| ▮▮▮▮ | Unit 1: Whole Numb | 10 | 15.91 | 87.04% |
| | Unit 2: Decimal and | 11 | 15.66 | 96.77% |
| | Unit 3: Interest | 9 | 20.88 | 95.61% |
| | Unit 4: Ratios, Rates | 5 | 17.07 | 91.67% |
| Total for ▮▮▮▮ | | 35 | 17.28 | 93.03% |

History, Sociology, and Psychology

71.     CTU employs this scheme of pretending students spend far more hours on Intellipath than they actually do, and nowhere near the amount of time needed to meet the federal

credit hour requirements, across the majority of CTU's course offerings. Additional examples of this pattern and practice include History 101 1803B, Sociology 102 2003B, and Psychology 102 1803B. In these three courses, the average student times in Intellipath hovered around just 10 hours, again far lower than the amount required to meet federal credit-hour regulations.

72.    In History 101 1803B, the average time students spent on Intellipath was 10.31 hours. Taking the first student listed on the corresponding report, the student spent 37 minutes (11 lessons times 3.38 minutes weighted average per lesson), finishing every unit and passing with an average score of 75 percent:

| Person | Objective (core) | Total lessons | Average time (mins) | Average score |
|---|---|---|---|---|
| ▮▮▮ | Unit 1: The Post-Wa | 3 | 2.47 | 100% |
|  | Unit 2: Social Unrest | 3 | 2.42 | 62.50% |
|  | Unit 3: The Post-Wa | 1 | 0.12 | 0% |
|  | Unit 4: The Technolo | 2 | 8.88 | 50% |
|  | Unit 5: Terrorism an | 2 | 2.33 | 87.50% |
| Total for ▮▮▮ |  | 11 | 3.38 | 75% |

73.    In Sociology 102 2003B, the average time students spent on Intellipath was 10.08 hours. Taking the first student listed on the corresponding report, the student spent 5 hours total in the course, finishing every unit and passing with an average score of 71 percent:

| Person | Objective (version) | Total activi | Total time | Average score |
|---|---|---|---|---|
| ▮▮▮ | Unit 1: Sociology (CTU 20 | 20 | 1:24 | 73.48% |
|  | Unit 2: Culture and Subc | 7 | 1:11 | 62.87% |
|  | Unit 3: Sociological Inter | 7 | 1:12 | 70.17% |
|  | Unit 4: Sociological Rese | 9 | 0:44 | 74.24% |
|  | Unit 5: Reflection and Sc | 3 | 0:29 | 60% |
| Total for ▮▮▮ |  | 46 | 5:01 | 70.94% |

74.    In Psychology 102 1803B, the average time students spent on Intellipath was 9.40 hours. Taking the first student listed on the corresponding report, the student spent less than 10 hours total in the course, finishing units 2-5 and passing with a score of 64 percent:

| Person | Objective (core) | Total activities | Total time | Average score |
|---|---|---|---|---|
| ▉▉▉▉▉▉▉ | Unit 2: Biology of the Brain | 15 | 1:17 | 48.52% |
| | Unit 3: Development, Person: | 40 | 5:07 | 70.51% |
| | Unit 4: Learning and Memory | 19 | 2:19 | 66.67% |
| | Unit 5: Psychiatric Disorders | 15 | 1:09 | 67.86% |
| Total for▉▉▉▉▉▉▉▉▉▉▉▉▉ | | 89 | 9:52 | 63.83% |

75.    AIU has used Intellipath in exactly the same way to limit the hours students spend on course work to successfully complete their classes. While Relator did not have access to AIU's internal Intellipath reports, Relator knows from Relator's work at CTU and Relator's efforts to stop the university from engaging in this fraud (as explained below) that AIU has engaged in the very same scheme all driven by Perdoceo's senior leadership, including Ms. Komar. As with the examples listed above, a review of the actual content AIU has provided on Intellipath along with the actual time AIU students have spent on Intellipath for AIU's various course offerings will show actual learning hours far lower than what AIU has reported and far lower than what is needed to meet the federal credit hour requirements for these classes.

76.    Providing college-level work and the minimum content per credit hour are mandatory to receive federal student aid under Title IV. As DOE has made clear, the federally defined credit hour provides "a quantifiable, minimum basis for a credit hour that, by law, is used in determining eligibility for, and the amount of, Federal program funds that a student or institution may receive." 75 Fed. Reg. 66845. It ensures that the credit hours assigned by schools have "the necessary educational content to support the amounts of Federal funds that are

25

awarded to participants in Federal funding programs and that students at different institutions are treated equitably in the awarding of those funds." *Id.* at 66844.

77.     Consistent with this purpose, the government would not have paid CTU and AIU claims for Title IV aid had it known that they failed to provide the necessary content under federal credit hour requirements. Indeed, DOE would have suspended or terminated CTU and AIU from participating in federal student aid programs based on their failure to comply with these requirements and their PPAs.

78.     Perdoceo could have designed Intellipath to provide a sufficient amount of college-level content to meet the minimum required learning hours per course. It also could have designed Intellipath to replace any skipped-over content with additional content a student needs to learn. Quality aside, Perdoceo could have at a minimum designed Intellipath to require students to clock a certain amount of time on Intellipath. But Perdoceo is not concerned with the quality of their students' education or ensuring CTU and AIU provide the minimum amount of required content to meet federal credit hour requirements. Perdoceo's sole objective is keeping students enrolled and maximizing the Title IV funding it receives on their behalf.

## II.     DEFENDANTS' FALSIFICATION OF CREDIT ASCRIPTION DOCUMENTS

79.     Knowing they do not provide anywhere near the content required under federal credit hour regulations, CTU and AIU have inflated the number of learning hours recorded on Intellipath to falsify their compliance with federal credit hour requirements and remain eligible for Title IV funding.

80.     At CTU, for Dr. Johnson and her group, that has involved hiding the actual time students spend on Intellipath from faculty, staff, the government, and HLC. Prior to 2017, CTU did not even have a methodology for calculating learning hours to ensure compliance with

federal credit hour requirements—it simply extracted millions of dollars in financial aid money without any regard for those requirements. In 2017, HLC conducted a routine audit to review various policies and procedures. During the visit, HLC noted CTU's failure to have learning hour documentation supporting its claimed compliance with federal credit hour regulations. HLC directed CTU to develop transparent credit hour calculation policies and a reliable method to quantify student course work.

81.     Executives at Perdoceo (CEC at the time), including Ms. Komar, along with Dr. Johnson and Dr. Stein, were alarmed that CTU's accreditation was in jeopardy. But they refused to take any steps to boost the amount of course content because of the adverse impact it would have on student retention, and thus, the flow of financial aid money. Instead, they devised a plan to address HLC's concerns by inflating Intellipath hours and the amount of course content on which these reported hours are based.

82.     Dr. Johnson's first step was to instruct faculty to conduct a comprehensive review of any existing credit ascription documentation and to calculate the time spent on each learning activity in CTU's courses. Faculty could not complete this task, however, given the lack of information for each course and the lack of any internal method for calculating student work. With HLC's mandate to demonstrate CTU's calculation of learning hours, Dr. Johnson had no choice but to develop a new "credit ascription" process to calculate learning hours for each course, knowing that given the dearth of content, the calculations would need to be falsified to meet the federal credit hour requirements.

83.     Dr. Johnson assigned the credit ascription project to CTU's then Vice Provost. In or around October 2017, the Vice Provost assembled a team of faculty to create new documentation for each course. The team included Dr. Troka, and several representatives from

COGEP. The team created templates called credit ascription worksheets ("CAWs") along with a handbook detailing a process to verify courses met the minimum learning hour requirements. The CAW template was designed so faculty could calculate the time commitment of each activity (e.g., Intellipath, reading, discussion boards) purportedly to ensure total learning hours met federal credit hour requirements.

84.    In truth, however, Dr. Johnson and her group recognized they would need to hide from HLC and the government the fact that CTU purposely designed courses to contain little content. They decided to calculate learning hours for Intellipath content based on outlier student times spent on the platform (rather than a reliable calculation of the actual content provided or time spent) to make it appear courses met the federal credit-hour requirements.

85.    To accomplish this, they designed the CAW to take the "maximum time spent [by a student], excluding outliers" for each section, after the course was completed, and retroactively populate that time in the CAW *for each student in the course*.[6] Dr. Johnson and her group told Relator and others working on the project that using the maximum hours was a fair representation of actual hours spent by students (and thus a fair approximation of the actual content in the course) because the maximum time spent by the top student was within a few hours of the average time spent by all students. Dr. Johnson and her group knew this was not the case, but wanted to conceal from faculty, the government, and HLC the startlingly low times virtually all students actually spent on Intellipath.

_____

[6] CTU defines "outliers" not as the maximum or minimum time reported by any student, but merely as mis-transcriptions or mistakes in the data.

86.     CTU's approach of calculating the "maximum time spent, excluding outliers" is especially misleading because using outliers with abnormally high Intellipath times is exactly what CTU does. If CTU used a reliable measure of the actual content provided in each course, or the actual time students spent on Intellipath, none of the course offerings would meet the federal credit-hour requirements. They would not even come close. As just one example, in English 104, there was only <u>one</u> student in 2020 across five different class sessions who met or exceeded the more than 90 hours of Intellipath class time CTU reported for the course. Even worse, the average Intellipath time of the students in this class was only 5.6 hours (including students who withdrew from the class). Of the students who completed all five units, the average time was just 7.9 hours (with a median of only 5.3 hours).

87.     To further cement and conceal this scheme to inflate the actual time students spent on Intellipath for CTU's course offerings, Dr. Johnson instructed faculty completing the CAWs to leave the Intellipath portion of the CAWs blank, directing Dr. Troka to fill in all Intellipath data. Perdoceo's Ms. Komar provided Dr. Troka with Intellipath student reports revealing the actual times students spent by course, and Dr. Troka dutifully filled the maximum Intellipath times into the corresponding CAWs. Dr. Troka resigned in March 2018, shortly after the project was completed. Virtually none of the CAWs on which Dr. Troka input Intellipath times have been updated and, at least as of November 2020, CTU used them to support its claimed compliance with the federal credit hour requirements (despite regularly removing content to make courses easier).

88.     Had the government known CTU failed to provide anywhere near the required amount of course content and falsified its records for calculating learning hours, DOE would not

have paid CTU claims for Title IV aid and would have suspended or terminated CTU from participating in federal student aid programs.

89.     AIU has engaged in the exact same stratagem. Like CTU, AIU provides minimal course content and uses Intellipath in the majority of its courses, employing Determine Knowledge and other tactics to skip students past lessons, allowing them to complete courses in a very short amount of time—nowhere near the minimum number of learning hours to meet credit hour requirements and qualify for federal student aid. And like CTU, AIU has inflated the number of learning hours it reports for students on Intellipath to make up for this massive shortfall.

90.     Instead of using the maximum student-hour device CTU employs, however, AIU uses a more mechanical approach. In both cases, the school ignores the actual hours students spend in Intellipath and reports a much higher number of learning hours to misrepresent compliance with the federal credit-hour requirements.

91.     Specifically, AIU counts Intellipath time as "45 minutes per lesson for 100 level classes, 60 minutes per lesson for 200, 300, 400 and grad level courses." The actual time students spend per lesson on Intellipath is substantially shorter, typically amounting to a few minutes per lesson or even less. In many instances the actual time per lesson is zero as Intellipath allows and even encourages students to skip the lessons altogether. The end result at AIU is the same as it is at CTU. The school uses a grossly inflated number of Intellipath hours for each student, entirely disregarding the actual amount of content provided, and the actual time students spent on Intellipath.

92.     By failing to provide its students the learning hours it claims to provide, and by falsifying its credit ascription documents, AIU like CTU fraudulently obtained hundreds of

30

millions of dollars in financial aid. The government would not have paid AIU's claims for Title IV aid had it known that it failed to provide the necessary learning hours under federal credit hour requirements. Indeed, DOE would have suspended or terminated AIU from participating in federal student aid programs based on its failure to comply with the federal credit hour requirements and its PPA.

## III. DEFENDANTS' FALSE STATEMENTS AND MISREPRESENTATIONS REGARDING COMPLIANCE WITH FEDERAL CREDIT HOUR REQUIREMENTS

93.     As explained above, CTU and AIU are required to submit an Application for Approval to Participate in the Federal Student Financial Aid Programs. And following their initial certification, they need to re-apply for certification at least every six years. CTU and AIU most recently submitted recertification applications in 2020.

94.     In these applications, CTU and AIU identified the number of credit hours required for each program for which they wished to be eligible for federal student aid. In doing so, CTU and AIU represented that their course offering satisfied the minimum required learning hours consistent with the federal credit hour definition in 34 C.F.R. § 600.2—meaning that for each credit hour, students completed an amount of work that reasonably approximated at least one hour of classroom or direct faculty instruction and two hours of out of class work each week.

95.     CTU and AIU's representations regarding these credit hour requirements were false because CTU and AIU have failed to provide anywhere near the required educational content. For example, in certifying that a program requires 180 credit hours (as most of CTU and AIU's bachelor programs do), CTU and AIU represented that students will receive and complete 5,400 learning hours of educational coursework. As detailed above, however, CTU and AIU

31

actually provide nowhere near the amount of learning hours necessary to satisfy any of the credit hour assignments it reported to DOE.

96.     If DOE knew that CTU and AIU misrepresented the amount of academic instruction provided to their students through these false credit hour representations on their Applications for Approval to Participate in the Federal Student Financial Aid Programs, DOE would not have certified them for continued participation in the Title IV programs and would have denied their claims for federal financial aid.

97.     After fraudulently obtaining eligibility, CTU and AIU entered into PPAs with DOE. In each PPA, CTU and AIU certified that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." Each PPA also expressly conditioned CTU and AIU's participation in and payment under Title IV programs on its compliance with all statutory and regulatory provisions under Title IV, including the credit hour requirements.

98.     If DOE knew that CTU and AIU intentionally failed to comply with the credit hour requirements under the Title IV programs, it would not have entered into a PPA with either school. As a result, CTU and AIU would have been excluded from the Title IV programs, and DOE would have denied their claims for federal financial aid. Instead, CTU and AIU fraudulently induced DOE to enter PPAs by omitting material information about their credit hour failures and falsely certifying compliance with all statutory and regulatory provisions under Title IV. Because of this fraudulent inducement, CTU and AIU's subsequent claims for payment under those PPAs were false and fraudulent.

99.     Furthermore, CTU and AIU falsely certified their ongoing compliance with the terms of the PPA. Before drawing down funds in the G5 system, CTU and AIU had to certify

that their Title IV "funds are being expended . . . for the purpose and condition of the [PPA]." Unless schools submit this express certification of compliance with their PPAs, they cannot receive any funds through the G5 system. If DOE knew that CTU and AIU's G5 certifications were false because CTU and AIU failed to comply with the Title IV credit hour requirements incorporated into their PPAs, DOE would not have released student aid payments to either school.

100.    Finally, in submitting claims for payment through the COD system, schools must identify a student's enrollment status, which intrinsically represents the number of federally defined credit hours provided to the student. Federal regulations define a full-time student as receiving at least 12 credit hours per quarter; a three-quarter-time student as receiving 9 credit hours per quarter; a half-time student as receiving 6 credit hours per quarter; and a less-than-half-time student as receiving less than 6 credit hours per quarter.

101.    DOE relies on a school's representations regarding a student's credit hours when it determines whether and how much to pay in student aid. For example, a student enrolled full-time (i.e., more than 12 credit hours) receives twice as much Pell Grant aid as a student enrolled half-time. And students enrolled less than half-time (i.e., receiving less than 6 credit hours) are ineligible for Direct Loans altogether.

102.    If DOE knew the student enrollment status CTU and AIU reported through the COD system were based on false and inflated learning hour calculations and otherwise failed to comply with the federal credit hour requirements, it would not have made Title IV payments to CTU and AIU.

103.    Because CTU and AIU have failed to provide the required educational content and learning hours per credit for every course that uses Intellipath, the vast majority of their

students have not received an amount of educational content necessary to justify their enrollment status reported by CTU and AIU through the COD system. If DOE knew the truth, it would not have paid CTU or AIU any Title IV aid for these students. This would have dramatically reduced the federal aid paid to CTU and AIU and rendered most of their students ineligible for Pell Grants and Direct Loans altogether.

104.    Defendants also have misrepresented to HLC their compliance with federal credit hour regulations to maintain their accreditation and keep financial aid money flowing. Defendants have hidden from HLC their scheme to provide a fraction of the required course content and learning hours to increase retention and engaged in a cover-up to hide the fraud.

105.    CTU also has misrepresented to HLC that the "maximum time spent, excluding outliers" reflects the average student time on Intellipath and fairly approximates the amount of content in each course. Defendants failed to disclose and took affirmative steps to conceal that the actual Intellipath time for virtually *all* students was regularly 80 to 100 fewer learning hours than what CTU reported.

106.    CTU also failed to disclose to HLC that it closely tracked retention and would modify live courses by removing content, rewriting questions, or skipping lessons entirely to make courses easier; that it programmed Intellipath to skip content with Determine Knowledge and to "backfill" lessons a student never completed; that it would change the threshold percentage required to pass courses; that it "beefed up" course materials prior to HLC visits only to strip out the materials after the visit was complete; and that it provided unrepresentative sample courses to HLC for review, such as business courses with little to no Intellipath work.

107.    AIU has engaged in similar tactics, failing to disclose the minimal course content it provides, the manner in which it calculates Intellipath time, how far removed the calculations

are from the actual time students spend on Intellipath, and how it programmed Intellipath to skip content and engaged in other tactics to minimize the course content students receive.

## IV.    RELATOR'S EFFORTS TO REPORT AND STOP THE FRAUD

108.    In or around May 2019, a Program Development Administrator at CTU was working to transfer the CAWs to a new database called "CourseTune." During this process, the administrator took it upon herself to verify Intellipath data for Math 102 and Math 106, two courses CTU had recently updated and for which Relator was the course owner. During the process, they reached out to Relator to review Math 102 and Math 106 CAWs, stating that the learning hour calculations were far below the required minimum hours. Relator reached out to Ms. Komar and Perdoceo's (then CEC) Vice Provost of Technology in an attempt to investigate the issue. Through this interaction, Relator discovered the calculations on the CAWs significantly overstated the actual time spent on Intellipath for these courses. The Vice Provost nonetheless continued transferring CAWs to CourseTune without verifying Intellipath data for any other courses.

109.    Relator assumed Dr. Johnson was unaware the Intellipath hours were inflated and immediately alerted her to the issue. Dr. Johnson was unfazed. She dismissed Relator's concerns, saying "yes, saw that in the sheet. Thanks for following up." Dr. Johnson subsequently rebuffed several efforts by Relator to discuss the issue.

110.    A short time later, on June 5, 2019, in an email to Relator, the Vice Provost noted that they could not recreate the number of Intellipath hours reported on various CAWs without "manipulat[ing]" the data. Relator realized the Intellipath calculation issue was widespread and requested another meeting with Dr. Johnson to present these concerns.

111.     After repeated requests, Dr. Johnson finally agreed to meet with Relator where Relator confronted her with the fact that CTU is inflating learning hours for every course with Intellipath (the vast majority of CTU's offerings), in every college in the university. Dr. Johnson again dismissed Relator's concerns. She sternly instructed Relator to refrain from amending any CAWs, and shortly after the meeting, removed Relator from all work, projects, and meetings regarding the CAWs, including creating or reviewing CAWs for new courses under Relator's purview.

112.     On September 11, 2019, Relator spoke with Dr. Ruth Tarantine, the Dean of the College of Nursing, regarding the conversations with Dr. Johnson relating to the inaccuracy of Intellipath calculations. Dr. Tarantine was extremely troubled by this information, particularly given that many courses she created in the nursing program use Intellipath. A few months later, on November 4, 2019, Dr. Tarantine told Relator that she too raised her concerns with Dr. Johnson, but Dr. Johnson expressed having "no appetite" for discussions regarding the way Intellipath hours are calculated. Dr. Tarantine told Relator to "let it go." Shortly after, Dr. Johnson appointed Dr. Tarantine Vice Provost of Curriculum.

113.     After several more months of raising concerns, to no avail, Relator raised the issue with Dr. Amy Sloan, former Program Chair of COGEP, who by that time had been promoted to COGEP Dean. Dr. Sloan carried out many of Dr. Johnson's directives without question. Like Dr. Johnson, Dr. Sloan ignored Relator's concerns. A few days later, in an effort to silence Relator, Dr. Johnson and Dr. Sloan stripped Relator of most of Relator's job responsibilities. On September 8, 2020, Dr. Sloan told Relator that Dr. Johnson instructed her "not to assign [Relator] any projects that extend past November." In early November 2020, Relator resigned from CTU.

36

*　　　*　　　*

114.　　Defendants' long-running financial aid fraud scheme has been extremely profitable, involving the vast majority of CTU and AIU undergraduate course offerings, along with a sizeable percentage of their graduate and specialty courses. This misconduct has occurred since at least Perdoceo's introduction of Intellipath at CTU and AIU in 2012 and continues to this day. It has resulted in Defendants obtaining hundreds of millions of dollars in federal financial aid they did not qualify for and were ineligible to receive. It also has resulted in hundreds of thousands of CTU and AIU students receiving a substandard education, and for most of them, failing to complete their secondary education at all, precisely the type of adverse outcome the federal credit hour requirements are supposed to prevent.

## CLAIM FOR RELIEF

115.　　Relator Fiorisce LLC realleges and incorporates by reference all of the allegations set forth herein.

116.　　This is a claim for treble damages and penalties under 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).

117.　　As set forth above, in violation of 31 U.S.C. § 3729(a)(l)(A), Perdoceo, CTU, and AIU have knowingly presented or caused to be presented false or fraudulent claims for payment or approval by (i) submitting to the United States requests for Federal Pell Grants and Federal Direct Loans while knowingly failing to meet the federal credit hour requirements that serve as both a condition of payment and participation under Title IV and without disclosing this failure; (ii) making false certifications and statements and material omissions regarding their compliance with the credit hour requirements in the Title IV programs in grant and loan Common Records submitted through COD system and through draw-down requests in the G5 system; and (iii)

37

making false certifications and statements and material omissions regarding their compliance with the credit hour requirements in their various other Title IV applications and participation documents, including their PPAs and their Applications for Approval to Participate in the Federal Student Financial Aid Programs.

118.    In addition, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B), Perdoceo, CTU, and AIU knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim by (i) creating false credit ascription documents with inflated Intellipath times that made it appear learning hours met Title IV credit hour requirements; and (ii) relying on their falsified credit ascription documents to report false credit hours for their programs in their various Title IV certifications, applications, and participation documents.

119.    Likewise, in violation of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B), Perdoceo, CTU, and AIU fraudulently induced DOE to enter into PPAs by falsely certifying or representing that they had complied with all statutory and regulatory requirements governing a school's participation in Title IV programs, including the credit hour requirements, and by omitting material facts regarding their failure to provide minimum learning hours for the majority of their courses. Because of this fraudulent inducement, CTU and AIU's subsequent claims for payment under those PPAs were false and fraudulent.

120.    These false claims, records, statements, certifications, and omissions were material to the government's payments of Federal Pell Grants and loans under Title IV. Had the government known that Perdoceo, CTU, and AIU provided students with a fraction of the minimum learning hours required under the Title IV programs, it would have had a natural tendency to influence or been capable of influencing the government's decision to approve loans

38

and provide Defendants funding for financial aid. Indeed, the government would not have made payment at all and would have terminated Defendants from continuing to participate in any Title IV programs.

## PRAYER FOR RELIEF

WHEREFORE, Relator Fiorisce LLC requests the following relief:

A.      Declaring that Perdoceo, CTU, and AIU's practices and conduct have violated the federal False Claims Act, 31 U.S.C. §§ 3729-3733.

B.      Enjoining and restraining Perdoceo, CTU, and AIU from engaging in any conduct, contract or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

C.      Entering judgment against Defendants in an amount equal to three times the damages suffered by the United States due to their violations of the False Claims Act.

D.      Directing that Perdoceo, CTU, and AIU, pursuant to 31 U.S.C. §§ 3729 *et seq.* pay the maximum penalty provided under 31 U.S.C. § 3729(a), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the regulations thereunder at 28 C.F.R. § 85.5, for each violation of 31 U.S.C. § 3729(a);

E.      Directing that Relator Fiorisce LLC receive the maximum award allotted by 31 U.S.C. § 3730;

F.      Directing that Perdoceo, CTU, and AIU pay Relator Fiorisce LLC's costs, including attorneys' fees as provided by law;

G.      That this Court award pre- and post-judgment interest on any damages awarded to the United States or Relator;

H.     Directing such other equitable relief as may be necessary to redress Perdoceo, CTU, and AIU's violations of the United States law; and

I.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Relator hereby demands a trial by jury.

Dated:  May 19, 2023

**CONSTANTINE CANNON LLP**

/s/ *Marlene Koury*
Marlene Koury
CONSTANTINE CANNON LLP
150 California Street, Suite 1600
San Francisco, CA 94111
Tel: (415) 639-4001
Fax: (415) 639-4002
mkoury@constantinecannon.com

Gordon Schnell
CONSTANTINE CANNON LLP
335 Madison Avenue, Floor 9
New York, NY 10017
Tel: (212) 350-2700
Fax: (212) 350-2701
gschnell@constantinecannon.com

Christopher McLamb
Hendrik Lammers
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue NW #1300N
Washington, DC 20004
Tel: (202) 204-3500
Fax: (202) 204-3501
cmclamb@constantinecannon.com
hlammers@constantinecannon.com

*Counsel for Relator*
