**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00573-RBJ

UNITED STATES ex rel. FIORISCE LLC,

    Plaintiff,

        v.

PERDOCEO EDUCATION CORPORATION;
COLORADO TECHNICAL UNIVERSITY, INC.; and
AMERICAN INTERCONTINENTAL UNIVERSITY, INC.,

    Defendants.

---

**ORDER on MOTION TO DISMISS**

---

The False Claims Act, 31 U.S.C. §§ 3729-3723 ("FCA") "allows for the recovery of civil penalties and treble damages from anyone who defrauds the government by submitting fraudulent claims for payment." *United States ex rel. Reed v. KeyPoint Government Solutions,* 923 F.3d 729, 735-36 (10th Cir. 2019). Anyone can file an FCA or "*qui tam"* action. The government has the right to intervene and take over the case. But if the government elects not to intervene, the plaintiff, known as a "relator," proceeds on the government's behalf and is rewarded with a portion of whatever is recovered.

Fiorisce LLC filed this *qui tam* action in February 2011, claiming that the defendants – two colleges and their parent company -- have cost the United States hundreds of millions of dollars by making fraudulent claims for federal financial aid money despite providing their

1

students with only a fraction of the educational content that the financial aid programs require. After investigating the claims for approximately two years, the government elected not to intervene. Proceeding as the Relator, Fiorisce filed an Amended Complaint that is the operative complaint in the case. Defendants filed a motion to dismiss. The motion has been fully briefed, and it was argued on December 14, 2023.

## APPLICABLE LEGAL STANDARDS

The pending motion is brought pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Defendants make two arguments. First, they argue that relator's claims should be dismissed under the "public disclosure bar" of the FCA. The public disclosure bar "compels courts to dismiss *qui tam* claims 'if substantially the same allegations … as alleged in the action or claim were publicly disclosed,' unless the relator 'is an original source of the information.'" *Reed,* 923 F.3d at 737 (quoting 31 U.S.S. § 3730(e)(4)(A)). Although it has not been definitively decided in the Tenth Circuit to my knowledge, the public disclosure bar is generally viewed as an affirmative defense. *Reed,* 923 F.3d at 737 n.1. As such, "courts have considered undisputed documents provided by the parties in connection with Rule 12(b)(6) motions based on the public disclosure bar." *United States ex rel. Winkelman v. CVS Caremark Corp.,* 827 F.3d 201, 208 (1st Cir. 2016.

Second, defendants argue that even if the Court does not find that the public disclosure bar is dispositive, the claims against defendants Perdoceo Education Corporation and American Intercontinental University should be dismissed because those claims were not pled sufficient particularity. Complaints alleging violations of the FCA are governed by the pleading

2

requirements of Rule 9(b).   *United State ex rel. Lemmon v. Envirocare of Utah*, 614 F.3d 1163, 1171 (10th Cir. 2010).[1]   The complaint "need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme."   *Id.* at 1172.   "Practically speaking, FCA claims comply with Rule 9(b) when they 'provid[e] the who, what, when, where and how of the alleged claim.'"   *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (quoting *Lemmon,* 614 F.3d at 167).

## FACTUAL BACKGROUND

### A. The Amended Complaint.

Colorado Technical University, Inc. ("CTU") is a private for-profit college headquartered in Illinois with campuses in Aurora and Colorado Springs, Colorado.   American International University ("AIU") is a Georgia corporation with campuses in Atlanta and Houston.   CTU and AIU are wholly owned by Perdoceo Education Corporation, a Delaware corporation headquartered in Illinois.   The vast majority of CTU's (and I presume AIU's) students are enrolled in online programs and receive federal financial aid.   Amended Complaint, ECF No. 22, at 4-5.   Since at least 2011 CTU (and I presume AIU) has had a contract with the

---

[1] Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.   Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."   The rule is intended 'to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 987 (10th Cir. 1992).

Department of Education called a Program Participation Agreement ("PPA") that authorizes it to participate in federal student aid programs.

Fiorisce is an LLC created shortly before this lawsuit was filed. This was done, according to counsel during the argument, to avoid repercussions in the job market to the person who in reality is the relator in this case. She is an individual who worked at CTU as a faculty member in the College of General Education and Psychology ("COGEP") and was its University Program Director when she was "pressured to leave" CTU." *See id.* at 4.

According to the Relator, the story of this case began on October 29, 2010, when the U.S. Department of Education promulgated regulations defining a "credit hour" for purposes of eligibility for programs such as Pell Grants and Direct Loans which provide financial aid to students at qualifying institutions. *Id.* at 9. The regulations allegedly were created to curb abuse and inconsistent treatment of federal funds. *Id.* at 10. They provide that a credit hour is the amount of student work that approximates at least one hour of classroom instruction and two hours of out-of-class work each week for a minimum of fifteen weeks in one semester or ten to twelve weeks in one quarter, or the equivalent number of learning hours over a different period. 34 C.F.R. § 600.2 (2011).[2] *Id.* at 2. Essentially, this means that for a 4.5 credit hour course, the school must provide the equivalent of at least 135 hours of educational content. *Id.*

---

[2] The definition also embraces alternative methods of instruction such as lab work, studio work, internships, and other academic work. *Id.*

4

In 2012 Perdoceo, then known as Career Education Corporation ("CEC"), implemented a proprietary software program called Intellipath at CTU and AIU.   The concept of Intellipath seemed to be a good one.   At the beginning of a course, students are given a diagnostic test to determine how much of the prospective course material they already know.   Then, Intellipath skips that material and focuses on what the students need to learn*.*  *Id.* at 15.

According to the Relator, however, that is not how Intellipath was used.   She alleges that the diagnostic tests are overly simplistic and are easily passed.   Then no replacement content is added to the course to make up for the skipped hours.   The result is that the student is given credit for credit hours that contain only a fraction of the "learning hours" they should have received.  *Id.* at 15.   But, "[i]n an effort to conceal the minimal course work Defendants provide and the stratagems they employ to quickly funnel students through their courses, Defendants have misrepresented date from the Intellipath platform to vastly overstate the number of learning hours these courses contain so they appear to meet the federal credit hour requirements for financial aid."  *Id.* at 3.   Thus, the scheme at the center of the present case is defendants' "intentional failure to provide their students with anywhere near the amount of educational content – measured in 'credit hours' -- required under federal student aid programs.   Defendants provide only a fraction of the required content so they can maximize student retention and keep financial aid money flowing into their coffers."  *Id.* at 1.

In 2017 the Higher Learning Commission ("HLC"), CTU's accrediting agency, conducted a "routine audit" of CTU's policies and procedures.  *Id.* at 27.   HLC found that CTU did not have documentation supporting its compliance with federal credit hours regulations, and

5

it directed CTU to develop credit hours policies and a reliable method of quantifying student course work.  *Id.*

Concerned that CTU's accreditation was in jeopardy, CTU's senior management went to work.  However, Relator states, they did not do anything to increase the amount of course content, allegedly because that would adversely impact student retention and financial aid money.  Rather, under the direction of CTU's Vice Provost, a faculty team created a new template called "credit ascription worksheets" or "CAWs" and a handbook describing a process of verifying that courses met minimum learning hour requirements.  *Id.* at 27-28.  Relator alleges that this was essentially window dressing designed to feign compliance.  To continue to hide the truth from HLC, the team decided to calculate learning hours on Intellipath based on outlier students' times.  Thus, despite the appearance of new policies and documentation procedures, the results were the same.

In approximately May 2019, in the process of transferring CAWs to a new database called Course Time, a Program Development Administrator at CTU chose two of the Relator's courses, Math 102 and Math 106, to verify the Intellipath data.  The administrator determined that the learning hour calculations were "far below the required minimum hours."  *Id.* at 35. The Relator then reached out to Judith Komar, a Perdoceo (then CEC) employee who had been significantly involved in the creation of Intellipath, and to Perdoceo's Vice Provost for Technology, to understand what had happened.  She discovered that the calculations on CAWs did overstate the actual hours spent on Intellipath for those courses.  But she also learned that

the Vice Provost planned to continue transferring CAWs to Course Time without verifying Intellipath data for any other courses.   *Id.* at 35.³

The Relator alleges that when discovered the inflated Intellipath hours in Math 102 and Math 106, she assumed that Dr. Connie Johnson (CTU's Provost) was unaware of the situation. However, when she alerted Dr. Johnson to her concerns, she indicated that she knew about it, and she rebuffed Relator's further efforts to discuss it.   When Dr. Johnson finally did meet with her again, the Relator told her that CTU was inflating hours with Intellipath for every course at CTU.   Dr. Johnson told Relator to refrain from amending any CAWs.   Shortly thereafter, Dr. Johnson removed the Relator from all work involving the CAWs, including creating or reviewing CAWs for Relator's prospective new courses.   *Id.* at 35-36.

On September 11, 2019, Relator informed Dr. Ruth Tarantine, the Dean of the College of Nursing, of her conversations with Dr. Johnson about the Intellipath calculations.   Initially Dr.

---

³ The Amended Complaint provides several additional examples in which CTU certified that the course met the credit hour requirements, i.e., 135 hours of content, but internal CTU Intellipath reports show that the course provided only a fraction of the required hours of content:
- Sociology 102.3   In this 4.5 credit course, CTU allocated 116 of the required 135 learning hours to Intellipath content, but CTU actually provided fewer than 10 hours of Intellipath content to the students.   *Id.* at 18.
- University 104.   CTU allocated 120 of the required hours to Intellipath but provided 17 hours. *Id.*
- Communications 102.   Allocated 80 hours to Intellipath, provided 10 hours.   *Id.*
- English 104 and 105: Allocated 100 hours to Intellipath, provided 6 hours.   *Id.* at 19.
- University 104 and 201 (2020 data).   Allocated approximately 100 hours, provided about 5 ½ hours.   *Id.* at 21.
- History 101, Sociology 102, Psychology 102.   Each of these courses provided only 9 to 10 hours of Intellipath content.   *Id.* at 23-25.

7

Tarantine seemed concerned, but on November 4, 2019, Dr. Tarantine told Relator that she had expressed her concerns to Dr. Johnson and was told that Dr. Johnson did not wish to discuss it. Dr. Tarantine told the Relator to "let it go." Dr. Tarantine was promoted to Vice Provost of Curriculum. *Id.* at 36.

On January 1, 2020, CEC rebranded under the name Perdoceo. *Id.* at 4. Later in 2020 Relator went to Dr. Amy Sloan, the COGEP Dean, to express the concerns that she previously had expressed to Dr. Johnson and Dr. Tarentine. She states that Dr. Sloan, too, "ignored" her concerns. *Id.* Shortly thereafter Dr. Johnson and Dr. Sloan removed most of the Relator's job responsibilities. On September 8, 2020, Dr. Sloan told the Relator that Dr. Johnson instructed her "'not to assign [Relator] any projects that extend past November.'" *Id.* (quoting Dr. Sloan). In early November 2020 the Relator resigned. *Id.* at 4, 36.

The Department of Education most recently renewed CTU's PPA in May 2019, effective through March 31, 2021. *Id.* at 5. On December 20, 2020, CTU applied for recertification and renewal of the PPA. However, the application remains under review and had not yet been renewed as of the date of the Amended Complaint, May 19, 2023. *Id.*

   **B.   The Rest of the Story.**

In their motion to dismiss, defendants claim that the Amended Complaint omits facts that are important to the application of the public disclosure bar. First, on December 17, 2019, an Assistant Inspector General in the Department of Education's Office of Inspector General issued

an "Alert Memorandum" concerning AIU (the "OIG memo"). ECF No. 44-2.[4] The memo indicated that during HLC's comprehensive review of AIU's initial application for accreditation, HLC had uncovered issues concerning AIU's assignment of credit hours to certain undergraduate and graduate programs.

> Specifically, HLC found that AIU's 9-credit bachelor's courses are inflated in credit by as much as [redacted]% relative to common practice in higher education. … HLC also found that AIU's graduate courses seem inflated in credit by as much as [redacted].
>
> Despite these issues, HLC granted AIU full initial accreditation with no limitations on the programs it offered at the time of initial accreditation. This action by HLC is not in the best interest of students and calls into question whether the accrediting decisions made by HLC should be relied upon by the Department of Education when assisting students to obtain quality education through the Title IV programs.

*Id.* at 2.

The memo goes on to complain about the accreditation notwithstanding that AIU had been "found to have an 'egregious' credit policy' that 'is not in the best interest of students.'" *Id.* at 8. It added, "[s]ince HLC determined that the practices at AIU meet its standards for quality, without limitation, the Department should be concerned about the quality of education or training at other institutions accredited by HLC." *Id.*

Much of the remainder of the OIG memo provides more specific information drawn from the HLC investigation and is redacted in the copy provided by defendants. However, the

---

[4] The Court takes judicial notice of official government documents. It also takes judicial notice of published news articles, only to show what was in the public realm at the time, not to show that the articles were in fact true. *See, e.g., Von Saher v. Norton Simon Museum or Art at Pasadena,* 592 F.3d 954, 960 (9th Cir. 2010).

unredacted portions of the memo provided the following additional background: (1) AIU was first accredited by the Commission on Colleges of the Southern Association of Colleges and Schools ("SACS") in 1987; (2) CEC acquired AIU in 2001; (3) SACS received complaints about AIU in 2004 (the specifics are redacted) and placed AIU on probation for 12 months in December 2005; and (4) the probation was extended an additional 12 months but was finally removed in December 2007 after SACS found that the issues had been addressed. *Id.* at 3, 8-9.

HLC's president insisted that criticism based on just one issue at one institution was unfounded, and that although HLC was aware of problems with how AIU measured credit hours, but it decided it could grant accreditation and then make AIU shape up. *See* E. Kelderman, *Inspector General Warns Accreditor Over Online College, Raising Fears Among for Profit Institutions,* THE CHRONICAL OF HIGHER EDUCATION (Dec. 17, 2009), ECF No. 44-3 at 3. But the report "sent shock waves through the for-profit higher-education sector," and CEC's stock plunged by nearly 20 percent. *Id.* at 4. A financial analyst described the OIG memo as a "double whammy, "coming one day after a member of Congress called for hearings on the 'conduct of for-profit educational institutions in the United States.'" *Id.* at 5.

The regulations defining a credit hour were published on October 29, 2010. The Federal Student Aid Office of the Department of Education noted in a March 18, 2011 publication that "these regulations were developed only after the Department's Inspector General conducted reviews of three of the seven regional accrediting agencies and found the oversight of institutional assignment of credit hours insufficient at all three agencies." ECF No. 44-5 at 1. One such review was the review of HLC's accreditation of AIU. ECF No. 44 at 5.

10

According to defendants, federal student aid programs continued to be the subject of Department of Education and public scrutiny for the next decade. *See* ECF Nos. 44-10 (OIG final audit report on HLC, September 30, 2015); 44-9 (*We Need to Retain Protections Against Scam Online Schools,* THE CENTURY FOUNDATION (January 18, 2018); 44-11 (OIG recommendations, March 1, 2018); 44-8 (*What is Regular and Substantive Interaction,* ELEARNING GUIDE (March 8, 2019). These publications generally address such programs but do not home in on any of the defendants in this case or manipulation of credit hours.

Defendants particularly emphasize two news articles published in 2020. The first, *As Perdoceo Fights VA Suspension, Employees say Recruiting Abuses Persist,* [https://REPUBLICREPORT.ORG](https://REPUBLICREPORT.ORG) (June 15, 2020) was written by David Halperin, a self-employed lawyer with history of government service whose publication REPUBLIC REPORT describes its mission as "investigating how money corrupts democracy." *See* https.//www.republilcreport.org/about/. The article, filed in this case at ECF No. 44-7, discusses whether the United States Department of Veterans Affairs should eliminate CTU and AIU from its G.I. Bill Program because of deceptive advertising and recruiting practices. Halperin states that "Perdoceo schools have repeatedly been in trouble with law enforcement and sued by former students for deceptive and abusive marketing and recruiting." *Id.* at 2. The article mentions complaints that Intellipath exams are easy to pass. *Id.* at 6. It recounts Career Education Corporation's history of complaints and lawsuits. *Id.* at 6-7. It does not, however, discuss credit hours or the misrepresentation of such hours in Intellipath.

The second article, *Biden Must Cut Off Taxpayer Billions to Predatory Colleges That Ruin Students' Lives,* https.//www.REPUBLICREPORT.ORG (November 12, 2020), was also written by David Halperin and filed in this case at ECF No. 44-6.   The article claims that Perdoceo scams students, and that its recruiting abuses are ongoing.   *Id.* at 3-4.   It claims that classes at Perdoceo schools are of poor quality, and that exams are "almost impossible to flunk, because the company wants to keep students enrolled until they graduate or run out of financial aid."   *Id.* at 5.   Referring specifically to CTU, the article quotes a recruiter who was planning to quit as explaining, "Rationalizing why I work for a company that defrauds people doesn't mean that it's the right thing to do."   *Id.* at 6.   These are familiar themes from the Amended Complaint.   The article does not, however, discuss credit hours, learning hours, or Intellipath.

## ANALYSIS AND CONCLUSIONS

### A. The Public Disclosure Bar.

1. Were "substantially the same allegations "previously publicly made?

The public disclosure bar "does not require '*complete* identity of allegations.'"   *Reed,* 923 F.3d at 752 (quoting United States ex rel. Boothe v. Sun Healthcare Group, Inc., 496 F.3d 1169, 1174 (10th Cir. 2007)) (emphasis in original).   "[T]he operative question is whether the public disclosures were sufficient to set the government 'on the trail of the alleged fraud without [the relator's] assistance.'"   *Id.* at 744 (quoting *United States ex rel. Fine v. Sandia Corp.,* 70 F.3d 658, 571 (10th Cir. 1995)).

There is no question but that Perdoceo and other similar institutions have been on the government's radar for years.   However, when I focus on Relator's specific claims concerning

12

misrepresentation of credit hours and the use of Intellipath and CAWs by CTU to defraud students and the government, there is very little to be found in government publications or news articles.   The OIG memo did focus directly on credit hours issues at AIU in 2009.   Ironically, defendants rely heavily on that memo while also urging the Court to dismiss Relator's claims against AIU as not having been pled with sufficient particularity.   In any event, the OIG memo contributed to the development of regulations defining a credit hour, after which CTU implemented the Intellipath program.   Relator's claim is that CTU has used Intellipath and CAWs to misrepresent the actual content of the credit hours it certifies to the government, in violation of the regulations.   But the government publications and new articles cited by defendants do not discuss that.

The other event of possible significance is the fact, as pled by the Relator, that CTU's application of December 20, 2020 for the renewal and recertification of its PPA contract with the Department of Education has been under investigation but has not resolved for approximately three years, even though the prior renewal expired on March 31, 2021.   One could perhaps infer that an investigation of that length could not overlook Intellipath and the credit hours issue. However, the Court draws inferences in plaintiff's favor at the motion to dismiss stage.

Accordingly, I find that defendants have not shown that public disclosures have been sufficient to set the government on the trail of CTU's alleged fraud in the certification of credit hours without the Relator's assistance.   That finding requires that the motion to dismiss based on the public disclosure bar must be denied.

2. <u>Was relator an "original source of the information</u>?

Because of the Court's conclusion on the "substantially the same allegations" prong, I do not have to resolve defendants' alternative argument that plaintiff is not an "original source." However, to provide further clarity as to my thinking about their arguments, I will discuss the issue briefly.

An original source is "a relator with 'knowledge that is independent of and materially adds to the publicly disclosed allegations' and who gave the government this information before filing her *qui tam* claims."  *Reed,* 923 F.3d at 755 (quoting 31 U.S.C. § 3730(e)(4)(B)).   It is undisputed that the Relator gave her information to the government before she filed this lawsuit. "A relator 'materially adds' to public disclosures if her information 'is sufficiently important to influence the behavior of the recipient.'"  *Reed,* 923 F.3d at 756 (quoting *Winkelman,* 827 F.3d 201 at 211)).

Defendants argue that Fiorisce cannot be an original source because its claim "'was derived solely from second-hand knowledge.'"  ECF No. 44 at 10 (quoting United States ex rel. *Kuriyan v. Health Care Servs. Corp.*, No. 16-1148 JAP/KK, 2020 WL8079811, at *11 (D.N.M. Sept. 9, 2020)).   The argument is that by masking her identity, the former CTU officer essentially shot herself in the foot on the "original source" issue, because Fiorisce has no knowledge of anything that took place before it was created.   Whether or not that argument is technically sound, it is easily overcome if the underlying Relator identifies herself.   She plainly

must do so as the case heads into the discovery phase, so the problem, if it is a problem, will be moot.

Setting aside the technical issue, even if the Court's analysis of the "substantially the same allegations" prong were incorrect, I would find that the Relator's specific allegations about CTU's use of Intellipath and CAWs to misrepresent credit hours and her identification of the individuals in CTU's senior management who disregarded Relator's attempts to bring her concerns to their attention materially added value to the public disclosures. They did so by homing in on the specific way that CTU misrepresented credit hours to the government and by bolstering the claim that the misrepresentation was done with scienter.

### B. The Claims Against Perdoceo and American International University.

Here, I agree with the defendants. The manipulation of credit hours data via Intellipath may well have been known to and approved by Perdoceo. After all, CTU is wholly owned by Perdoceo, and Ms. Komar of Perdoceo was instrumental in developing the Intellipath program. Moreover, Perdoceo has apparently been the subject of criticism, complaints, and lawsuits for years. As for AIU, in addition to its own history of credit hours problems as discussed in the OIG memo, the facts that it too is wholly owned by Perdoceo, it uses Intellipath, and the Relator professes to know that it does the same things as CTU, suggest to me that AIU may be manipulating credit hours in a similar fashion.

The problem is, the Relator's allegations regarding AIU, even if sincere, are conclusory summaries of her beliefs. *See* ECF No. 22 at ¶¶75, 92, 95-99, 102-103, 107. There are no examples, and more basically, Relator had not alleged facts that with any degree of particularity

15

show the who, what, when, where and how of the alleged fraud by AIU. The same is true as to Perdoceo. Rule 9(b) demands more in an FCA case.

## ORDER

Defendants' motion to dismiss, ECF No. 44, is GRANTED IN PART AND DENIED IN PART. It is granted to the extent that the claims against Perdoceo Education Corporation and American Intercontinental University, Inc. are dismissed without prejudice. The motion is otherwise denied.

Dated this 4th day of January, 2024

BY THE COURT:

R. Brooke Jackson
Senior U.S. District Court Judge